# United States Court of Appeals
## For the First Circuit

---

Nos. 12-1300
    12-2220

UNITED STATES OF AMERICA,

Appellee,

v.

JORGE CORREA-OSORIO; DENISE SHEPARD-FRASER,

Defendants, Appellants.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Daniel R. Domínguez, U.S. District Judge]

---

Before

Thompson, Lipez, and Barron,
Circuit Judges.

---

Alejandra Bird López for appellant Jorge Correa-Osorio.
Claudia Leis Bolgen, with whom Bolgen & Bolgen was on brief, for appellant Denise Shepard-Fraser.
John A. Mathews II, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, and Nelson Pérez-Sosa, Assistant United States Attorney, Chief, Appellate Division, were on brief, for appellee.

---

April 22, 2015

---

**THOMPSON, <u>Circuit Judge</u>.**

**OVERVIEW**

Jorge Correa-Osorio and Denise Shepard-Fraser stand convicted of cocaine offenses. Both ask us to reverse, though for different reasons. Correa, for example, thinks the judge quadruply erred — first by admitting identification evidence (because a witness made him off a highly suggestive and unreliable procedure), next by admitting key statements under the coconspirator exception to the hearsay rule (because the government showed neither that he was in on the conspiracy nor that the statements furthered the conspiracy's aim), then by admitting evidence of a cocaine-filled suitcase (because the evidence was irrelevant, prejudicial, and confusing), and finally by committing cumulative error (because the net effect of what the judge did made his trial fundamentally unfair). He is wrong. Shepard, for her part, thinks the judge doubly erred — first by finding the evidence sufficient to support her convictions (because the government did not prove guilty knowledge) and then by giving her a 128-month prison term (because the sentence was procedurally and substantively unreasonable). But she is wrong too. We will explain our thinking shortly, right after we set out the case's background.

**BACKGROUND**

This case should seem familiar to any regular reader of the Federal Reporter, given that it concerns yet another major

cocaine conspiracy involving a creative distribution network, a large cast of coconspirators (some with colorful nicknames), and a turncoat who became the government's star witness.

(1)
The Conspiracy at a Glance

Running from June 2006 to June 2008, the conspiracy — led by a man named Manuel Santana-Cabrera (also known as "El Boss") — operated like this.  Recruited couriers took commercial flights from San Juan to mainland cities, including Philadelphia and New York.  Before boarding, they would check luggage filled with old clothes, pillows, blankets, etc. — stuff that could get through security without incident.  Other conspirators working at the airport would switch the checked luggage with luggage packed with cocaine.  Couriers would then fly to their destinations, claim their checked bags, and hand them off to a taxi driver — known to some as "Manopla" — who was in on the conspiracy too.  Couriers would make $3,000 a trip.

(2)
The Conspiracy's Unraveling

In September 2006 DEA agents in Philadelphia heard from their colleagues in San Juan that there was something fishy about the flight itineraries of José Vega-Torres and two others, who were flying from San Juan to New York after a layover in Philly.[1]  The Philadelphia agents looked for and found the trio's bags.  After a

---

[1] DEA stands for Drug Enforcement Administration.

-3-

drug-detecting dog alerted to the odor of drugs, agents got a search warrant. Their search struck pay dirt: each bag had at least 13 brick-shaped objects wrapped in a blanket, and the objects field-tested positive for cocaine.

Agents arrested Vega and his two sidekicks in New York. Vega initially told a pack of lies about why he had cocaine in his luggage, who had given it to him, who had asked him to go to New York, and who had chauffeured him to the airport. But he eventually agreed to come clean and cooperate in exchange for the government's promise not to indict his wife on conspiracy-related charges too (she was with him on one of his smuggling trips to New York). His cooperation later led to the arrest of Correa and Shepard (plus others) and to much of the evidence the government used at trial (Correa and Shepard were tried together).

(3)
The Case Against Correa

At trial Vega identified Correa, calling him by a nickname, "El Don." And he testified about the times that he saw him in 2006, apparently (he did not recall the exact dates).

The first time, Vega had gone to leader Santana's house with a conspirator named Israel Martes-Canales (nicknamed "Shaq"). While there, he and Martes helped load six suitcases into the trunk of Correa's car. The suitcases were similar in size and weight to drug luggage Vega had picked up in New York. Correa told Santana that he was actually using his wife's car and that he would "get in

-4-

trouble" if she found out what he was up to. And after Correa left, Santana told Vega that "Don" was "in charge of taking bags into the airport and putting them inside the plane."

Vega later saw Correa working at the San Juan airport. About to jet off to New York to deliver more cocaine, he spotted Correa on the tarmac, loading bags onto a plane.

As for the last occasion, Vega went one time with Martes and another conspirator named Ricardo Soler-Rivera to drop a bag off at Correa's house. Soler said the bag had $90,000, just before he gave it to Correa.

Seeking to undermine his credibility, Correa's lawyer extensively cross-examined Vega on a number of topics. Vega, for example, testified about the inducements he received for cooperation, the big one being the government's pledge not to go after his wife if he played ball. Beyond that, he confessed to not telling agents about "El Don" during an early debriefing, even though other conspirators' names easily rolled off his tongue. And despite saying how a conspirator told him that the mainland-bound suitcases contained cocaine, he admitted to not personally knowing whether that was in fact true. He also admitted to never seeing Correa handle any of his checked luggage. What is more, he said that "El Don" had braided hair — something the defense played up because Correa later testified that he did not have braids in 2006.

On redirect Vega said that he personally knew Correa was part of the Santana-drug-trafficking cabal. But the government did not just rely on Vega's testimony to help tell the conspiracy's story. As part of its case-in-chief, the government, for example, also presented (over defense objections) evidence concerning the seizure of a cocaine-filled suitcase at the San Juan airport on October 4, 2007. The prosecution's theory was that evidence about the suitcase constituted overt-act evidence linking the defendants to the conspiracy. Here is what you need to know.

Marionel Báez-Peña — an airport-worker-turned-convict — testified that he loaded drug luggage onto planes for two people: kingpin Santana and a person named Maximo Bencosme-Aybar (also known as "Phantasma"). Báez had done two jobs for Santana. And he was set to do one for Bencosme on October 4.[2] But he was not feeling well that day, so he asked airport-worker Miguel Ramos-Santi to help out. Another airport worker, Luis del-Valle-Febres, testified that early on the morning of October 4, Ramos asked him to put a tag on a suitcase left on a cart. And del-Valle did just that.

Unfortunately for those involved, DEA-agent Hector Tapia-Gerena — a member of the team investigating Santana's drug doings

_____

[2] Responding to the prosecutor's request that he "[t]ell the jury what happened in October of 2007," Báez said, "[w]ell, in October of 2007 I had a job with [Bencosme] on that day." The "job," Báez explained, was to stow a drug bag on a departure-bound plane.

— got (according to his testimony) a tip that day about a suspicious suitcase at the San Juan airport.  Springing into action, he headed for the airport's baggage carousel and spied an unattended suitcase on a cart.  The bag's tag read September 23.  A drug-sniffing dog detected the presence of contraband.  And x-rays of the suitcase showed — in outline — block-shaped items.  Agents opened the bag and saw pillows, towels, and t-shirts, plus 13 bricks of powder that tested positive for cocaine.  One thing led to another, and agents arrested Báez, Ramos, and del-Valle.

Testifying in his own defense, Correa denied important elements of the accusations against him.  For example, he said that until his arrest, he had never met Santana.  And he added that the first time he laid eyes on Vega was in court.  He also painted a picture of himself as an educated, intelligent person of strong character who lived a very simple lifestyle — one incompatible with a criminal way of life.  He insisted too that he did not have access to some areas while working at the airport and so could not have snuck drug bags in as alleged.

(4)
<u>The Case Against Shepard</u>

The case against Shepard essentially rests on a single event — her flying from San Juan to New York on September 9 and back again on September 10.  The crucial testimony came from Vega, who had known her for about 20 years and who had what he described

as a "friendly" relationship with her in 2006.  This is what he had to say.

Already in New York, Vega and Martes went with cabbie Manopla to a New York airport to pick up Shepard and two others. Vega saw the threesome walking from the airport to the cabstand, each carrying two suitcases.  Vega and Martes helped put the bags in the taxi's trunk.  Manopla then dropped everyone off at a hotel and sped off with the luggage.  The accommodations were a little tight — the five from the cab (Vega, Martes, Shepard, and her two companions) stayed with four or five others in a single room a conspirator (the record does not say who) had booked for what ended up being Shepard's one night there.  Everyone — except for Vega — came from the same housing project in Puerto Rico.

At some point (the record does not indicate exactly when), Santana called Martes and ordered him to pick up a cash-filled bag at another locale and get the money back to Puerto Rico. So Martes and Vega hopped in a cab, grabbed a bag of $261,000 in cash, and headed back to the hotel.  They paid each person in the room — including Shepard — $3,000 for helping get the suitcases to New York.  Then they rolled up the rest of the money in socks and crammed the rolls into their cohorts' luggage.  Vega, however, did not say who else was there when he and Martes rolled and packed the cash — most importantly for present purposes, he did not say whether Shepard saw the "show."

Martes flew back to San Juan, apparently to handle a pressing matter (it is unclear just when he left). Vega stayed behind, bought the others — including Shepard — tickets to San Juan, and jetted back with them on September 10 (their flight left New York at 9:00 p.m. on September 10 and landed in San Juan at 12:55 a.m. the next day). Martes and Soler rendezvoused with the group at the San Juan airport and drove them to Santana's house. Only Vega and Martes went inside, however. And there they gave Santana the cash.

Looking to score some points on cross-examination (she presented no evidence in her defense), Shepard's lawyer got Vega to talk about his run-ins with the law. Her attorney also got him to repeat that he had lied to federal agents a bunch of times before. And her lawyer got him to admit that he could not look Shepard in the eye in court (other than when he pointed to her sitting at counsel table). But the prosecution's redirect brought out that he personally knew that she was a member of the Santana-drug-trafficking syndicate (a damning bit of evidence when it comes to one of her arguments on appeal, i.e., that she hadn't a clue what was in the suitcases; more on this later).

(5)
Verdicts and Sentences

After hearing all the evidence, the jury convicted Correa and Shepard each on two counts: conspiring to distribute cocaine and possessing with intent to distribute cocaine. See 21 U.S.C.

-9-

§§ 841(a)(1), 841(b)(1)(A), and 846. The judge then handed out stiff prison sentences, with Correa and Shepard getting concurrent terms of 132 months and 128 months, respectively.

Which takes us to today's appeals.[3]

**CORREA'S APPEAL**

Correa believes that the judge slipped by admitting Vega's in-court identification of him. He also thinks that the judge stumbled by admitting three "hearsay" statements under the coconspirator exception: Vega's statement calling him "El Don," Santana's statement calling "El Don" the go-to guy for getting drug bags on planes, and Soler's statement saying a bag for "El Don" had $90,000. On top of that he thinks that the judge blundered by admitting evidence concerning the suitcase seized on October 4. And lastly he believes that the judge's errors — even if harmless on their own — cumulatively violated his fair-trial rights. Though passionately argued, these points do not get him the reversal he seeks.

(1)
In-Court Identification

Leading things off is Correa's claim that Vega identified him at trial under unduly-suggestive conditions — an identification, he adds, that was not otherwise reliable. He never raised this objection below, limiting us to plain-error review — a

---

[3] We will fill in more details as we go along.

-10-

standard that requires him to prove four things:  (1) an error, (2) that is clear or obvious, (3) which affects his substantial rights (i.e., the error made him worse off), and which (4) seriously impugns the fairness, integrity, or public reputation of the proceeding.  See, e.g., United States v. Olano, 507 U.S. 725, 734-37 (1993); United States v. Kinsella, 622 F.3d 75, 83 (1st Cir. 2010).  Applying that not-so-defendant-friendly standard, see United States v. Williams, 717 F.3d 35, 42 (1st Cir. 2013) — and knowing too that we must fight off any "reflexive inclination" to reverse unpreserved errors, see Puckett v. United States, 556 U.S. 129, 134 (2009) — we see no way to reverse here.

First, some context.  Vega testified for the government over three days.  During the first day or so he talked at length about a number of things, including:  his personal life (he is married with three children), how and why he joined the Santana-commanded conspiracy (a friend told him about it, knowing he needed money), what he did for the conspiracy (helping get cocaine to New York and cash back to Puerto Rico), and the fallout from his arrest in New York (pleading guilty to drug crimes, agreeing to cooperate with authorities, and getting benefits for his cooperation).

On the second day Vega brought up Shepard (explaining, for example, how he had known her for two decades and was

"friendly" with her in 2006). And he identified her for the jury.[4] That afternoon — following a lunch break — the prosecutor asked Vega about his visiting Santana's house. On one of those occasions, Vega said, a "person known as 'the Don' was there." Responding to a question from the judge, Vega clarified that Santana and "El Don" were different people. And if "El Don" is in the "courtroom," the prosecutor said to Vega, "can you describe him or her?" "Yes," Vega replied, "[t]he gentleman with the long-sleeved shirt." Correa's lawyer "concede[d] that [Vega] is referring to my client."

Kicking off cross-examination, Correa's counsel asked Vega if he had met with DEA agents and prosecutors to "discuss what you were going to testify" to. "Yes," Vega answered. Counsel (as we said) then later tried to chip away at the in-court identification, getting Vega to say that "El Don" had braided hair (reminiscent of a look favored by a Puerto Rican rapper known as "Don Omar") and eliciting from Correa that he (Correa) did not have braids in 2006 (which again is around the time Vega supposedly saw him). And counsel repeated this misidentification theory in his closing argument, telling the jury that Vega simply "confus[ed] my client with somebody else." Vega had an obvious motive to lie,

_____

[4] "If you see [Shepard]," the prosecutor said, "could you describe what he or she is wearing for the jury"? "She is wearing a blue jacket," Vega replied. Shepard's lawyer said he had no objection "whatsoever" to the in-court identification.

counsel also stressed, because his wife's freedom was at stake.

Now back to Correa's newly-minted argument. He believes that because he was the only male defendant at defense table, Vega obviously knew whom he should single out — any watcher of TV crime dramas can surely tell which person in the courtroom is the defendant, he adds. And this procedure, he says, was so unnecessarily suggestive that it raised a very serious likelihood of misidentification — meaning the judge should have barred the evidence on due-process grounds, even without an objection from counsel. We see things differently.

The Constitution, caselaw holds, guards against convictions tied to evidence of questionable reliability — not by banning the evidence's admission, but by giving defendants the tools to convince jurors the evidence is not belief-worthy. See Perry v. New Hampshire, 132 S. Ct. 716, 723 (2012). There is, however, a small exception for police-arranged identifications — think photo arrays, showups, and lineups. See id. at 724. Due process, we see, bars trial courts from admitting such evidence "if the . . . identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification" — irreparable because trial mechanisms would not help a jury distinguish between reliable and unreliable identifications. See Neil v. Biggers, 409 U.S. 188, 197 (1972) (quoting Simmons v. United States, 390 U.S. 377, 384 (1968)); see

-13-

also Manson v. Brathwaite, 432 U.S. 98, 116 (1977).  Based on the Biggers line of cases, courts confronted with a challenge to a police-run identification process must ask, first, whether the process was unduly suggestive, and, if yes, whether the identification was still reliable given the totality of the circumstances.[5]  See, e.g., United States v. Arthur, 764 F.3d 92, 99-100 (1st Cir. 2014); United States v. Jones, 689 F.3d 12, 17 (1st Cir. 2012).  Deterring police misuse of identification procedures is the key principle animating what we will call the Biggers test.  See Perry, 132 S. Ct. at 726.

The deterrence rationale falls away, obviously, if the police did not arrange the identification.  And thus, our judicial superiors tell us, the Biggers test does not apply and an altogether different method of analysis takes center stage:  if a witness identifies the defendant under circumstances that are not police-rigged, any dispute about the identification's reliability is for the jury, with the defendant protected by ordinary criminal-trial safeguards — the right to an effective counsel who can try to poke holes in the witness's identification, the right to be presumed innocent and be convicted by a jury of one's peers only by proof beyond a reasonable doubt, etc.  See id. at 723, 728-30

---

[5] Reliability typically turns on (1) the witness's opportunity to look at the person, (2) his degree of attention, (3) the accuracy of his prior description, (4) how sure he was when he made the identification, and (5) the amount of time between the crime and the identification.  See, e.g., Biggers, 409 U.S. at 199-200.

-14-

(abrogating United States v. Bouthot, 878 F.2d 1506, 1516 (1st Cir. 1989), among other cases).

A key question is:  In cases like ours — involving a prosecutor's securing an in-court identification under supposedly suggestive circumstances — which approach applies, Perry's or Biggers's?[6]  One could argue either way.

On the one hand:  In a recent case bearing an uncanny resemblance to Correa's — involving as it does in-court identifications of a male defendant seated at counsel table, with the police playing no part in his getting picked out — the Eleventh Circuit (by a 2-1 vote) read Perry as holding that the Biggers test applies only if the complained-of suggestion arose from improper police conduct.  See United States v. Whatley, 719 F.3d 1206, 1215-17 (11th Cir. 2013).  And staying with Perry, that Circuit rebuffed the defendant's due-process challenge, concluding that he got the same process "identified in Perry as constitutionally sufficient" for persons not identified through police-rigged procedures.  Id. at 2016-17.

On the other hand:  The Seventh Circuit (by a 2-1 vote) — after citing Perry — more recently used the Biggers test to reject a due-process attack on an in-court identification of a

_____

[6] The Supreme Court handed down Perry after Correa's trial. But we consider the law as it exists on appeal in deciding whether a judge's action was plain error.  See Henderson v. United States, 133 S. Ct. 1121, 1126 (2013).

black male seated at defense table.  See Lee v. Foster, 750 F.3d 687, 691-92 (7th Cir. 2014).  Because nothing in the record showed that the witness had made the identification "solely on the basis of [the defendant's] race" or that the prosecutor had asked the witness to point to the black male at counsel table, that Circuit found no undue suggestion.  Id.

We need not choose sides in this debate today.  And that is because Correa's identification argument fails under either Perry or Biggers.[7]

(a)
Applying Perry

Assuming without deciding that Perry governs our situation, we note the following.  The jurors had ring-side seats for Vega's identification.  Hearing him speak and reading his facial expressions and body language, they were best positioned to detect any hint of unsureness when he singled-out Correa.  They also had an up-close look at Vega during the defense's cross-examination of him — and counsel cross-examined him with gusto,

_____

[7] United States v. Espinal-Almeida does not say which case rules supreme in our situation.  Quoting Perry, we noted that "due process 'does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement.'"  699 F.3d 588, 603 n.16 (1st Cir. 2012) (quoting Perry, 132 S. Ct. at 730) (emphasis added by Espinal-Almeida).  Espinal-Almeida focused on police conduct (specifically, whether something an officer had done meant an identification was police-arranged), not on prosecutorial conduct. So we can put that case to one side.  Also, and interestingly, neither side has briefed the issue — both assume Biggers controls.

-16-

getting him to say, for example, that "El Don" had braided hair when Correa testified that he did not wear his hair that way in 2006. Plus, the jurors heard counsel's attack on Vega's credibility during summation, with counsel arguing (among other things) that Vega had "confus[ed] my client with somebody else" and that he had every incentive to tell agents whatever they wanted to hear (keeping his wife out of jail was incentive number one). And of course the jury found Correa guilty despite the presumption of innocence and the beyond-a-reasonable doubt burden of proof.

Correa protests that the identification does not square with due process because he was seated at the defense table when Vega fingered him. But the government did not put him there. Also keep in mind that he had a constitutional right to be present at trial, see Illinois v. Allen, 397 U.S. 337, 338 (1970), and defendants (who have to sit somewhere, clearly) usually sit at counsel table to assist in their defense.

Simply put, Correa received all the safeguards Perry stamped sufficient to protect a defendant's due-process rights in this context. See Perry, 132 S. Ct. at 728-30 (explaining that the way to handle unreliable evidence is through the adversary system, which includes the assistance of counsel, the ability to confront witnesses, the right to introduce evidence, and the presumption of innocence). Which is why his argument loses under Perry.

(b)
Applying the Biggers Test

Alternatively, assuming without deciding that the Biggers test holds sway, we have this to say. Sure, every in-court identification has "some element of suggestion." Perry, 132 S. Ct. at 727.[8] What matters is whether there was undue suggestion (words like "unnecessary" and "impermissible" can substitute for "undue," by the way). And that is where Correa gets tripped up.

An in-court identification may be unduly suggestive if, for example, the prosecutor drew the witness's attention to the defendant (say, by pointing to him) or asked questions that suggested the hoped-for result,[9] or if the defendant looked different from others in the courtroom or at counsel table when the identification occurred (say, by being the only black person

_____

[8] The sainted Judge Friendly, see David M. Dorsen, Henry Friendly: Greatest Judge of His Era (2012), once called in-court identifications — "where the defendant is sitting at the counsel table" — "perfunctory," labeled their effect "weak[]," and said "only" their "weakness . . ., along with [their] traditional character, saves [them] from condemnation as being [themselves] impermissibly suggestive." Brathwaite v. Manson, 527 F.2d 363, 367 n.6 (2d Cir. 1975), rev'd on other grounds, 432 U.S. 98 (1977). "[T]here is always the question how far in-court identification is affected by the witness' observing the defendant at the counsel table," he also said. United States ex rel. Phipps v. Follette, 428 F.2d 912, 915 (2d Cir. 1970). But he noted too that "[m]ere statement" of this problem "indicates what great weight must be given to the determination of the judge who saw and heard the witness." Id.

[9] See, e.g., United States v. Greene, 704 F.3d 298, 307-08 (4th Cir. 2013).

present).[10]  These are constitutional danger zones, for sure.  Yet

the record reveals no such problems here, however.  And Correa does

not argue otherwise — these special problems do not appear in his

brief and so any argument along those lines is waived.  See, e.g.,

United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

Instead he basically says that he had a huge "pick me"

sign on him because (again) he was the only male defendant at

counsel table, and it was that — and that alone — which made the

situation unduly suggestive.[11]  But he does not cite — and we could

not find — any federal-appellate case supporting his position (our

court has not addressed the issue), though we did spy a case from

another circuit undercutting his claim.  See United States v. Bush,

749 F.2d 1227, 1232 (7th Cir. 1984) (noting that "[t]he only

suggestive circumstance identified by defendant is that he sat at

counsel table" and holding that "[t]his circumstance alone is not

---

[10]  See, e.g., United States v. Rogers, 126 F.3d 655, 657-58
(5th Cir. 1997); United States v. Murdock, 928 F.2d 293, 297 (8th
Cir. 1991); United States v. Archibald, 734 F.2d 938, 942-43 (2d
Cir.), modified & reh'g denied, 756 F.2d 223 (2d Cir. 1984).  But
see United States v. Curtis, 344 F.3d 1057, 1063 (10th Cir. 2003)
(agreeing that identifying a "[d]efendant as the robber, when the
robber was a black man and [d]efendant was the only black man in
the courtroom, might be somewhat suggestive, but it is not
unconstitutionally so").

[11]  His trial lawyer was a man, we note in passing.

enough to establish a violation of due process").[12]  Simply put, he never gets to first base under the <u>Biggers</u> test.

(c)
Summing up so Far

The plain-error standard is "extremely" difficult to prove.  <u>United States</u> v. <u>Vigneau</u>, 187 F.3d 70, 82 (1st Cir. 1999). And rightly so, since the standard's central aim is "to encourage timely objections," <u>see</u> <u>United States</u> v. <u>Dominguez Benitez</u>, 542 U.S. 74, 82 (2004) — a goal that (hopefully) deters unsavory sandbagging by lawyers (<u>i.e.</u>, their keeping mum about an error, pocketing it for later just in case the jury does not acquit) and gives judges the chance to fix things without the need for appeals and new trials, <u>see</u> <u>Puckett</u>, 556 U.S. at 134, 140.  But what happened to Correa was not plain error, because it was not error when measured against either <u>Perry</u> or <u>Biggers</u>.

_____

[12] A few months back Massachusetts's highest court — the Supreme Judicial Court ("SJC") — said that when "a prosecutor asks a witness at trial whether he or she can identify the perpetrator of the crime in the court room, and the defendant is sitting at counsel's table, the in-court identification is comparable in its suggestiveness to a showup identification."  <u>Commonwealth</u> v. <u>Crayton</u>, 21 N.E.3d 157, 166 (Mass. 2014).  But the SJC's opinion turned on state common-law principles, not on federal (or even state) constitutional ones.  <u>See</u> <u>id.</u> at 169 n.16.  And the SJC acknowledged that other courts hold that "'[t]he inherent suggestiveness in the normal trial setting does not rise to the level of constitutional concern.'"  <u>Id.</u> at 172 n.21 (quoting <u>Byrd</u> v. <u>State</u>, 25 A.3d 761, 767 (Del. 2011)).  Clearly then this case is not enough for Correa to prevail on plain error.  <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Marcano</u>, 525 F.3d 72, 74 (1st Cir. 2008) (per curiam) (emphasizing "that plain error cannot be found in case law absent clear and binding precedent").

-20-

## Responding to the Dissent[13]

The dissent thinks we are all wrong on the <u>Biggers</u> issue, insisting that the prosecutor so clearly manipulated the in-court identification — using an unnecessarily-suggestive process — that the judge should have found a <u>Biggers</u> violation without help from counsel.  <u>See</u> <u>United States</u> v. <u>Frady</u>, 456 U.S. 152, 163 (1982) (explaining that plain error means an error so obvious that a judge is "derelict in countenancing it, even absent the defendant's timely assistance in detecting it").  But nothing the dissent says points to plain error — <u>i.e.</u>, an "indisputable" slip up on the judge's part, given controlling precedent.  <u>See</u> <u>United States</u> v. <u>Jones</u>, 748 F.3d 64, 70 (1st Cir. 2014) (citing <u>United States</u> v. <u>Marcus</u>, 560 U.S. 258, 262 (2010)); <u>see</u> <u>also</u> <u>United States</u> v. <u>Caraballo-Rodriguez</u>, 480 F.3d 62, 70 (1st Cir. 2007); <u>United States</u> v. <u>Diaz</u>, 285 F.3d 92, 97 (1st Cir. 2002).

Here is the essence of the dissent's undue-suggestion thesis:  The prosecutor's prepping Vega, having him testify for over a day (which gave him plenty of time to eye Correa at counsel table), and then (and only then) having him pick Correa out infracted due process — an in-your-face infraction that should have spurred the judge to strike the identification.  The prosecutor, the dissent adds, should have done one of two things instead —

---

[13] We use "dissent" to refer to Judge Barron's separate opinion concurring in part and dissenting in part.

first, relied on an identification Vega made pretrial through non-suggestive means (no pretrial ID appears in the record, though), or, second, relied on an in-court lineup (we will call these his alternative-identification methods). But in our experience nothing odd went down here — certainly nothing amounting to a clear-cut constitutional violation.

Prosecutors (like other lawyers) prep witnesses (even if just to tell them to testify truthfully). And there is no hint in the record that the prosecutor crossed any line in prepping Vega (for example by coaching him to pick Correa). Importantly too, the dissent cites no law (let alone binding law) — and we know of none — saying that routine witness prep equals undue suggestion.

As for the identification's timing, even the dissent admits that prosecutors can (within wide margins) present their case in the order they wish. And the prosecutor did what any lawyer would do, eliciting background info from Vega — about how the Santana-controlled conspiracy ran (who did what, with whom, for whom, where, and when), for instance — which helped establish a foundation for identifying Correa.[14] Regardless, the dissent again cites no settled law — and we are aware of none — holding a prosecutor acts in an unduly-suggestive way simply by having a

---

[14] One of Correa's counsel's favorite objections was lack of foundation.

witness testify (here, for a day and a half) before identifying the accused.[15]

What is left is the dissent's talk of alternative-identification methods. Once again the dissent cites no controlling authority — and we found none — requiring out-of-court identifications or in-court lineups over the "usual practice" of having a witness identify the defendant from the stand (again, assuming the usual practice does not stray into the constitutional danger zone most recently referenced in footnote 15).[16]

---

[15] We say "simply" because we three judges agree that certain circumstances not present here — (1) a prosecutor's drawing a witness to the defendant or asking questions directly suggesting the desired-for result, or (2) a defendant's looking different from others in the courtroom — might make the in-court identification process unduly suggestive.

[16] See United States v. Brien, 59 F.3d 274, 278 (1st Cir. 1995) (mentioning the "usual practice"). Staying with the in-court-lineup issue, we see that a defendant can ask for — but has no right to — one or "other particular procedure[s]." United States v. Pérez-González, 445 F.3d 39, 48 (1st Cir. 2006); Brien, 59 F.3d at 279 (noting that to change the usual practice, it was "up to" defense counsel to offer a plan, which the judge could reject if he offers a "plausible justification" for doing so). Often a defendant does not want an in-court lineup, fearing that if a "fairly staged" one "would still likely result" in his identification, the lineup "would strengthen" the eyewitness's "credibility" and "undermine" the defense's "misidentification argument to the jury." Brien, 59 F.3d at 279. But again — and at the risk of repeating ourselves — we detect no settled caselaw allowing a prosecutor to force a defendant into an in-court lineup to get an identification.

-23-

Concluding, as we do, that the dissent's undue-suggestion critique does not add up to plain error (or, indeed, to error of any kind), we turn to Correa's other claims.[17]

## (2)
## "Hearsay" Statements

Correa does not contest the sufficiency of the evidence against him.  Rather he next complains that much of the government's case depended on hearsay statements not admissible under the coconspirator exception, which exempts from the hearsay rule comments made by a coconspirator during and in furtherance of the conspiracy.  See Fed. R. Evid. 801(d)(2)(E).  This is how that exception works.  If a defendant contests the admissibility of an alleged coconspirator statement, the judge may conditionally admit the evidence and put off ruling until the close of all the evidence.  See, e.g., United States v. Ciresi, 697 F.3d 19, 25-26 (1st Cir. 2012) (discussing United States v. Petrozziello, 548 F.2d

---

[17] Although we need not reach the issue, we are also unpersuaded by the dissent's claim that Vega's identification of Correa was too unreliable for the jury to consider.  To highlight just one problem with the dissent's claim:  The dissent worries that Vega's previous encounters with "El Don" were indirect, brief, and occurred five years before the in-court identification.  But these are usually matters for the jury to sort out.  See Jones, 689 F.3d at 18 (stressing that "it is only in extraordinary cases that identification evidence should be withheld from the jury") (internal quotation marks omitted); see also Perry, 132 S. Ct. at 727 (indicating that a jury should consider — among other things — how much time passed "between exposure to and identification of the defendant, whether the witness was under stress when he first encountered the suspect, how much time the witness had to observe the suspect, how far the witness was from the suspect, . . . and the race of the suspect and the witness").

20 (1st Cir. 1977)). Prosecutors must then prove by a preponderance of the evidence (apart from the statements themselves) the elements of admissibility under the exception — that the defendant and the speaker were coconspirators and that the speaker made the statement during the course and in furtherance of the conspiracy. See id. at 25; see also United States v. Piper, 298 F.3d 47, 52 (1st Cir. 2002). A judge's ruling on this score is called a "Petrozziello ruling." Ciresi, 697 F.3d at 25. If prosecutors fall short, the defendant can ask the judge to declare a mistrial or strike the statements. See, e.g., United States v. Mangual-Garcia, 505 F.3d 1, 8 (1st Cir. 2007).

Correa gripes about three statements admitted through Vega's testimony: Vega's statement pinning the "El Don" nickname on him, Santana's statement tagging "El Don" as the person in charge of getting drug bags on planes, and Soler's statement saying a bag handed to "El Don" had $90,000. In making this pitch, he does not deny being nicknamed "El Don."[18] Nor does he question Santana's and Soler's membership in the conspiracy. He just thinks that the prosecutors did not show it more likely than not (the usual preponderance standard) that he was the "El Don" who coconspired with the speakers or that the challenged comments furthered the conspiracy.

_____

[18] FYI: Correa's résumé (admitted as an exhibit) listed his email addresses as (emphases ours) "**eldon**0789@hotmail.com" and "**eldon**0789@gmail.com."

We typically give abuse-of-discretion review to the question of whether a statement is in fact hearsay. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Brown</u>, 669 F.3d 10, 22-24 (1st Cir. 2012); <u>United States</u> v. <u>Colón-Díaz</u>, 521 F.3d 29, 33 (1st Cir. 2008). And we usually review objections to a judge's <u>Petrozziello</u> ruling for clear error, <u>see</u>, <u>e.g.</u>, <u>Ciresi</u>, 697 F.3d at 26, knowing a party cannot show clear error if there are competing views of the evidence, <u>see</u>, <u>e.g.</u>, <u>United States</u> v. <u>Dowdell</u>, 595 F.3d 50, 73 (1st Cir. 2010).

Right off the bat, the parties fight over whether Correa did enough below to preserve the nickname argument for review (they agree he preserved the other arguments, however). We can sidestep that issue, though, because it is easier to decide the argument on the merits. <u>See</u> <u>United States</u> v. <u>Murphy</u>, 193 F.3d 1, 5 (1st Cir. 1999) (taking a similar tack in a similar situation).

Correa helpfully concedes one thing — that Vega was not at all clear on how he learned about the "El Don" moniker that he stuck Correa with. That is a very big deal because we need not worry about the coconspirator exception unless the contested comment constituted hearsay. <u>See</u> <u>id.</u> at 6. Correa speculates that Vega "could only have learned" about the "El Don" sobriquet "through hearsay" — <u>i.e.</u>, that Vega must have heard about the nickname from someone other than Correa. But the evidence does not foreclose the possibility that Vega did indeed hear about the "El

-26-

Don" handle from Correa.  True, Vega did testify that he did not chat with Correa the time he saw him at Santana's house.  Yet that hardly means that Vega did not catch Correa introduce himself to another there as "El Don."  And because no one can possibly know — based on what is before us — whether Vega got the nickname info via hearsay, Correa has not shown an abuse of discretion on this threshold issue.

Moving to the Petrozziello issue, Correa has not shown clear error with the judge's handling of the other statements — Santana's comment that "El Don" was the point man for getting the drug bags on planes, and Soler's remark that a bag for "El Don" had $90,000.  For one thing, the record — even leaving aside the hearsay statements themselves — demonstrates that Correa more probably than not was a coconspirator of the speakers.  Recall Vega's testimony about seeing Correa with conspiracy-chief Santana at Santana's home.  They had suitcases that resembled the ones Vega smuggled into New York.  The bags — which Vega helped load into the trunk of the car — weighed about the same too.  And after putting the bags into the auto, Vega heard Correa tell Santana that the car was his wife's and that this could land him in hot water with her if she knew what he was up to.  The evidence of Correa's conspiracy membership might not be overwhelming, but it suffices on a

preponderance standard.[19]  Or at least the judge did not clearly err in so concluding.  Also, the "in furtherance" requirement can be satisfied (among other ways) by statements identifying other conspirators, explaining how the conspiracy works, or updating members on the conspiracy's doings.  See, e.g., Ciresi, 697 F.3d at 29, 30; United States v. Díaz, 670 F.3d 332, 348-49 (1st Cir. 2012).  And using the preponderance test, the contested statements fit the bill.  Or so the judge was entitled to conclude without clearly erring.[20]

Two sets of issues down, two to go.

(3)
Evidence Concerning the Suitcase
Seized on October 4

Correa's penultimate argument — made and lost below, meaning abuse-of-discretion review is called for — is simple enough.  Prosecutors, he reminds us, presented evidence about the suitcase seized on October 4 to help establish the existence of the Santana-led conspiracy.  Yet, he insists, other evidence already in the record showed a Santana-run conspiracy, and no evidence tied this suitcase to that conspiracy.  Yes, he stresses, Báez did

---

[19] This is, after all, one of the lowest standards of proof on the books.  See United States v. Volungus, 730 F.3d 40, 46 (1st Cir. 2013).

[20] Clear error means the judge's action was "wrong with the force of a 5 week old, unrefrigerated, dead fish . . . ."  Toye v. O'Donnell (In re O'Donnell), 728 F.3d 41, 46 (1st Cir. 2013) (quoting S Indus., Inc. v. Centra 2000, Inc., 249 F.3d 625, 627 (7th Cir. 2001)).

-28-

testify that he himself helped sneak drug bags onto planes for both Santana and Bencosme. But, he notes, Báez made it crystal clear that he and others did the October 4 caper only for Bencosme, and there is zero evidence (to quote his brief) that Bencosme "ever worked for or with" Santana. So, his argument continues, evidence of the October 4 seizure was wholly irrelevant, unfairly prejudicial, and potentially confusing, given that it could have distracted the jury's attention from a material issue — namely, the existence (or not) of a Santana-headed conspiracy. See Fed. R. Evid. 403. His theory has a certain bite. But we need not decide whether he is right because any error — if error there was — was harmless and so not reversible.

Errors in admitting evidence are "harmless" unless the evidence "likely affected" the trial's outcome. See United States v. Landrón-Class, 696 F.3d 62, 71 (1st Cir. 2012) (parenthetically quoting United States v. Dunbar, 553 F.3d 48, 59 (1st Cir. 2009)); see also United States v. Adams, 375 F.3d 108, 113 (1st Cir. 2004). And as for whether a Santana-captained conspiracy was a real thing — the raison d'être for the suitcase evidence's presentation, Correa says — plenty of evidence showed that it was. Just remember all the testimony about how conspirators stashed drug bags aboard chosen planes in San Juan bound for New York, then dropped the drugs off in New York for sale, and then shipped cash back to San Juan, with Santana — a/k/a "El Boss" — pulling the strings.

Compared with all this, the suitcase evidence is a drop in the bucket. So we can say with "fair assurance" that the disputed evidence did not sway the jury's verdict, meaning Correa's second-to-last argument — like his others — goes nowhere.[21] See Landrón-Class, 696 F.3d at 71.

### (4)
### Cumulative Error

That leaves us with Correa's protest that, even if his claimed errors do not justify reversal individually, they do when taken cumulatively. But because we have espied only one assumed error that is harmless at that, the cumulative-error doctrine cannot help him. See United States v. DeSimone, 699 F.3d 113, 128 (1st Cir. 2012).

Enough said about Correa's appeal. Now on to Shepard's.

## SHEPARD'S APPEAL

Shepard attacks the sufficiency of the evidence to convict her and the reasonableness of her sentence. Though skillfully presented, her arguments do not persuade.

### (1)
### Adequacy of the Evidence

Sufficiency challenges rarely succeed, see United States v. Moran, 984 F.2d 1299, 1300 (1st Cir. 1993), and this one is no

---

[21] Correa sometimes calls the October 4 suitcase evidence "cumulative." But cumulative evidence is usually dismissed as harmless, see, e.g., United States v. Savarese, 686 F.3d 1, 14 (1st Cir. 2012), and again we have no reason to question the evidence's harmlessness here.

exception.  The gist of Shepard's argument — below and on appeal — is that prosecutors failed to prove beyond a reasonable doubt that she knew the bags she grabbed at the New York airport had drugs in them, as opposed to some other form of contraband.  And so, the theory goes, her conspiracy and substantive-possession convictions cannot stand.[22]  The judge disagreed.  We of course assess her claim de novo, viewing the evidence — including all fair inferences — in the light most agreeable to the verdict and asking whether a sensible jury could have convicted beyond a reasonable doubt.  See, e.g., United States v. Seng Tan, 674 F.3d 103, 107 (1st Cir. 2012).  Critically too, even if she has a plausible innocent explanation for her actions, we must affirm if — after viewing the record from the prosecution's vantage point — there was adequate evidence of her guilt.  See, e.g., United States v. George, 761 F.3d 42, 48 (1st Cir. 2014).

---

[22] The conspiracy charge required prosecutors to prove a knowing and intentional agreement between her and another to violate the drug laws, see United States v. Ramos-Mejía, 721 F.3d 12, 14 (1st Cir. 2013), while the substantive charge required them to prove her knowing possession of drugs with intent to distribute, see United States v. García-Carrasquillo, 483 F.3d 124, 130 (1st Cir. 2007).  We oversimplify slightly, but you get the picture.  Because the two charges required the government to prove that she acted knowingly, we examine her knowledge as a whole, rather than breaking it down for each count. One other thing. "'[K]nowledge' can be established by showing that a defendant was 'wilfully blind' to facts patently before [her]."  United States v. Rivera-Rodriguez, 318 F.3d 268, 271 (1st Cir. 2003).  The judge did not give a willful-blindness instruction, however.  Consequently we consider only whether the government proved her actual knowledge.

What sinks Shepard's sufficiency claim is Vega's testimony that he <u>personally knew</u> that she was a member of Santana's drug-trafficking enterprise.[23]  From that evidence a clear-eyed jury could readily infer that members like Shepard know that drug smuggling is a drug enterprise's lifeblood and that handling drugs is what members do.  See <u>United States</u> v. <u>Ortiz</u>, 966 F.2d 707, 712 (1st Cir. 1992) (explaining that "jurors are neither required to divorce themselves from their common sense nor to abandon the dictates of mature experience").  And a wide-awake jury could then go on to infer that Shepard knew from the suspicious happenings surrounding her New York trip — her getting $3,000 simply for jetting there on someone else's dime, grabbing a couple of suitcases from the airport's luggage carousel, and passing them off to others almost immediately, never to see the bags again, <u>etc.</u> — that the suitcases contained drugs.  See <u>id.</u>

Wait a minute, says Shepard, holes remain in the record — for example, there is no direct evidence that (1) she ever saw even a speck of drugs in Puerto Rico or in New York, that (2) she and Vega were anything more than mere acquaintances (Vega's cell phone had several conspirators' contact info, but not Shepard's),

_____

[23] Here are the money quotes from the prosecution's redirect examination of Vega:  "Mr. Vega-Torres," the prosecutor began, "based on your own personal knowledge, we want you to tell the jury who were the members of the Manuel Santana drug trafficking organization at the time that you were involved." "Denise Shepard" and El "Don," Vega replied, though he named other members too.

that (3) either Vega or anyone else ever so much as hinted that she would be lugging drug bags to a waiting taxi, or that (4) she was present when Vega and Martes rolled and packed the cash for the trip back to Puerto Rico. Even assuming that these are plausible theories of innocence, she gains nothing, "because the issue is not whether a jury rationally could have acquitted but whether it rationally could have found guilt beyond a reasonable doubt." Seng Tan, 674 F.3d at 107. Granted, the government's case may not have been "airtight" — most are not, we know. See Leftwich v. Maloney, 532 F.3d 20, 28 (1st Cir. 2008). But taking all the evidence — direct and circumstantial — in the light most flattering to the verdict, we think a levelheaded jury had enough to make a guilty-knowledge inference required to convict. See also United States v. Sawyer, 85 F.3d 713, 733 (1st Cir. 1996).

(2)
Reasonableness of the Sentence

That takes us to the dispute over Shepard's 128-month prison term — a sentence 8 months above the 10-year statutory mandatory minimum but 23 months below the bottom of the 151-188 month recommended guidelines range. She does not question the correctness of either the mandatory minimum or the guidelines range. But she does contest the procedural and substantive reasonableness of her sentence, offering lots of reasons why she should get a 120-month term after a sentencing do-over. We review preserved arguments for abuse of discretion and unpreserved ones

for plain error.  See, e.g., United States v. Tavares, 705 F.3d 4, 24 (1st Cir. 2013).  Ultimately, though, none of her arguments succeed.

(a)
Procedural Reasonableness

Shepard first accuses the judge of not considering every sentencing factor listed in 18 U.S.C. § 3553(a).[24]  But after listening to her lawyer argue for leniency (a plea that — among other things — referenced her pre-arrest rehabilitative efforts and stressed how a heavy sentence would hurt her family) and after hearing her statement (an "allocution," in legal lingo), the judge said that he had considered "all the factors."  And his comment "is entitled to some weight" — that is particularly true when a judge issues a within-guidelines sentence, see United States v. Clogston,

---

[24] There are seven factors.  Factor one is "the nature and circumstances of the offense and the history and characteristics of the defendant."  18 U.S.C. § 3553(a)(1).  Factor two is
> the need for the sentence . . . (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

Id. § 3553(a)(2).  Factor three is "the kinds of sentences available."  Id. § 3553(a)(3).  Factor four is the guidelines.  Id. § 3553(a)(4).  Factor five is "any pertinent policy statement . . . issued by the Sentencing Commission."  Id. § 3553(a)(5).  Factor six is "the need to avoid unwarranted sentence disparities."  Id. § 3553(a)(6).  And factor seven is "the need to provide restitution to any victims."  Id. § 3553(a)(7).

662 F.3d 588, 590 (1st Cir. 2011) (internal quotation marks omitted), and here (don't forget) we have a <u>below</u>-guidelines sentence.  But the judge said much more.  For example, he touched on the seriousness of her crimes ("hundreds of kilograms of cocaine were transported in this conspiracy" and "nothing" could have happened without her and other couriers like her), talked about her difficult family circumstances (she is a "widowed mother of five children"), highlighted her lack of criminal record, alluded to societal-protective concerns ("how many children are affected by drugs . . .?"), stressed the need to avoid unwarranted disparities between her sentence and Correa's (he had gotten 132 months).  And he concluded that a 128-month sentence — a term far lower than the 151-188 month guidelines range — served the purposes reflected in § 3553(a).  We see nothing resembling an abuse of discretion here.

Trying a different tack, Shepard argues that the judge put too much weight on one factor (eliminating unjustified sentencing disparities) and too little weight on others (her history and characteristics, as well as guidelines policy statements dealing with downward departures for things like family responsibilities).[25]  Over and over again we have said that judges are not required to "give each factor equal billing," noting that

---

[25] A quick word about sentencing disparities:  sentencers can consider disparities between codefendants, we have noted — even though § 3553(a)(6) chiefly addresses disparities among defendants nationwide.  <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Ayala-Vazquez</u>, 751 F.3d 1, 32 (1st Cir. 2014).

because sentencing outcomes "turn mostly on 'case-specific and defendant-specific'" nuances, "'[t]he relative weight of each factor will vary with the idiosyncratic circumstances of each case'" — and thus judges can tweak "'the calculus accordingly.'" United States v. Denson, 689 F.3d 21, 28-29 (1st Cir. 2012) (quoting United States v. Dixon, 449 F.3d 194, 205 (1st Cir. 2006)). The judge did what the caselaw permits. So again we find no abuse of discretion.

Shepard also contends — for the first time on appeal, though — that the judge did not adequately explain his reasoning for her sentence. But what we have already written shows she is wrong. A judge must say enough for us to meaningfully review the sentence's reasonableness. See United States v. Fernández-Cabrera, 625 F.3d 48, 53 (1st Cir. 2010) (adding that a judge's explanation need not be "precise to the point of pedantry"). And the judge's explanation was up to snuff — which is another way of saying that he committed no error in this respect, much less plain error.

(b)
Substantive Reasonableness

Not only is Shepard's sentence procedurally reasonable — it is substantively reasonable too, which is to say not too harsh under the "totality of the circumstances." Gall v. United States, 552 U.S. 38, 51 (2007). Her arguments otherwise — that her family circumstances and pre-arrest rehabilitation call for a 120-month term instead of a 128-month stretch, and that the judge placed too

much emphasis on minimizing unjust sentencing disparities — are essentially a rebranding of her failed procedural-unreasonableness theories. When all is said and done, a claim like hers is a tough sell — more so when the sentence comes within a correctly-calculated guidelines range, see Clogston, 662 F.3d at 592-93, and here (as we have said, hopefully without trying the reader's patience) we have a below-guidelines term! For every case there is a range of reasonable punishment. See, e.g., United States v. Walker, 665 F.3d 212, 234 (1st Cir. 2011). And because Shepard's sentence (backed by the judge's plausible explanation) does not fall outside "the expansive universe" of acceptable outcomes, we spot no abuse of discretion — which leads straight to affirmance. See United States v. King, 741 F.3d 305, 308 (1st Cir. 2014).

**FINAL WORDS**

Our work over, we **affirm** Correa's and Shepard's convictions, and we **affirm** Shepard's sentence too.

**-Concurring and Dissenting Opinion Follows-**

**BARRON, Circuit Judge, concurring in part and dissenting in part.** I fully join the majority's treatment of Denise Shepard-Fraser's challenges to the sufficiency of the evidence and the reasonableness of her sentence. I cannot join, however, the majority's treatment of Jorge Correa-Osorio's challenge to the in-court identification. In my view, that challenge has merit, and, accordingly, I would reverse the judgment of conviction on the ground that the District Court plainly erred in allowing the jury to weigh that evidence.

## I.

Eyewitness testimony is undeniably powerful. That testimony is all the more powerful when the eyewitness identifies the defendant right in front of the jury. Ordinarily, we let juries weigh such testimony, just as they may weigh any other admissible evidence. But in certain circumstances, concerns about the reliability of an in-court identification -- with all the persuasive force that comes from the witness identifying "that man" as the person who committed the crime -- require more than faith in the jury's capacity to evaluate what is reliable and what is not. See, e.g., Kampshoff v. Smith, 698 F.2d 581, 585 (2d Cir. 1983) ("[D]oubts over the strength of the evidence of a defendant's guilt may be resolved on the basis of the eyewitness' seeming certainty when he points to the defendant and exclaims with conviction that veils all doubt, '[T]hat's the man!'" (second alteration in

-38-

original) (quoting <u>United States</u> v. <u>Wade</u>, 388 U.S. 218, 235-36 (1967))).

One such circumstance arises when the government elicits the identification in court after having used suggestive out-of-court means to prompt the witness to make an earlier identification. <u>See</u> <u>Simmons</u> v. <u>United States</u>, 390 U.S. 377, 382 (1968); <u>see also</u> <u>Manson</u> v. <u>Brathwaite</u>, 432 U.S. 98 (1977). The classic out-of-court, government-designed, suggestive means are a stacked lineup, <u>see</u> <u>Foster</u> v. <u>California</u>, 394 U.S. 440, 442-43 (1969), a highly suggestive photo array, <u>see</u> <u>Simmons</u>, 390 U.S. at 382, or, perhaps even worse, a show-up -- in which the government brings the suspect before the witness in a one-to-one confrontation, <u>see</u> <u>Stovall</u> v. <u>Denno</u>, 388 U.S. 293, 295 (1967).

When the government uses such out-of-court prompts unnecessarily, due process bars the jury from weighing the in-court identification unless it survives review under the so-called <u>Biggers</u> factors. <u>See</u> <u>Neil</u> v. <u>Biggers</u>, 409 U.S. 188, 199-200 (1972); <u>see also</u> <u>United States</u> v. <u>Maguire</u>, 918 F.2d 254, 264-65 (1st Cir. 1990) ("The Supreme Court has declared generally the same test for the admissibility of an in-court identification subsequent to a suggestive out-of-court identification as it has employed for admission of an allegedly suggestive pretrial out-of-court identification."). Courts use those factors to decide whether the in-court identification arises from the witness's prior encounters

with the person identified rather than from the influence of the out-of-court suggestive prompt the government has used. See United States v. Castro-Caicedo, 775 F.3d 93, 97 (1st Cir. 2014). And when those factors indicate a substantial risk that the suggestive prompt did corrupt the in-court identification -- say because the witness encountered the person identified years before and never since, and then only in conditions not likely to make the memory stick with any accuracy -- then the jury may not consider the in-court identification. Biggers, 409 U.S. at 198.

Correa does not argue to us that an out-of-court suggestive prompt preceded this in-court identification. He instead argues that what happened in the courtroom was alone so suggestive as to necessitate review under Biggers. And I conclude that, on these facts, Correa is right.

In reaching this conclusion, I recognize courtroom identifications are a traditional feature of criminal trials. But tradition should not distract from what to me seems obvious and what I do not understand the majority to deny. A prosecutor who orchestrates an in-court identification does at least risk exposing the jury to a very misleading form of unusually powerful and prejudicial testimony. For that reason, judges must be on the lookout for the case in which that risk is realized -- even if it is realized through means other than the government's prior use of egregious out-of-court suggestive prompts.

-40-

Here, we confront government-selected, in-court means for prompting that, though subtle, were plenty suggestive -- and unnecessarily so. So much so, in my view, that even on plain error review, an inspection of the identification's reliability under Biggers is required. See United States v. De León-Quiñones, 588 F.3d 748, 753 (1st Cir. 2009) ("To establish plain error, a defendant 'must show an error that was plain, (i.e., obvious and clear under current law), prejudicial (i.e., affected the outcome of the district court proceedings), and seriously impaired the fairness, integrity, or public reputation of the judicial proceedings.'" (quoting United States v. Griffin, 524 F.3d 71, 76 (1st Cir. 2008))). And, after undertaking that inspection, I further believe that due process demands a greater degree of assurance that Correa was "that man" than this identification can possibly supply. For that reason, I cannot agree that this in-court identification -- on which the government's case almost entirely rests -- may be the cause of Correa's long-term loss of liberty.[26]

---

[26] Correa received a prison sentence of eleven years. That term, I might add, is greater than the sentences received by all other members of the conspiracy, save for the leader, who received a sentence of 135 months -- only three months longer than Correa's. Correa and his co-defendant in this trial, Denise Shepard-Fraser, were the only alleged conspirators who went to trial. All others listed in the indictment, with the exception of one individual against whom charges were dismissed, entered into plea agreements.

## II.

To begin, I must first explain why <u>Perry</u> v. <u>New Hampshire</u>, 132 S. Ct. 716 (2012), does not shield from <u>Biggers</u> review any in-court identification that is untainted by a prior suggestive out-of-court prompt -- the seemingly categorical position the Eleventh Circuit takes. <u>See</u> <u>United States</u> v. <u>Whatley</u>, 719 F.3d 1206, 1216 (11th Cir. 2013). But the explanation is not hard to give. Simply put, <u>Perry</u> did not involve an in-court identification at all. <u>Perry</u> thus cannot set the standard for how we should treat one.

<u>Perry</u> concerned only whether a prior out-of-court identification should have been subjected to review under the <u>Biggers</u> factors. And <u>Perry</u> concluded that due process did not require such review in that case because the government did not orchestrate the out-of-court identification. <u>See</u> <u>Perry</u>, 132 S. Ct. at 725-27. Rather, as <u>Perry</u> explained, the witness had made a spontaneous out-of-court identification of the suspect while the suspect stood next to a police officer in a parking lot. <u>Id.</u> at 721-22. The Court noted that defense counsel -- in briefing and in argument -- explicitly conceded that the government "did not arrange the suggestive circumstances surrounding [the] identification," <u>id.</u> at 725, and that defense counsel did "not allege any manipulation or intentional orchestration by the police," <u>id.</u> (citing Tr. of Oral Arg. 5). There was, as the New

Hampshire Supreme Court found, "a complete absence of improper state action."  New Hampshire v. Perry, No. 2009-0590, 2010 WL 9105720, at *1 (N.H. Nov. 18, 2010) (quoting New Hampshire v. Addison, 8 A.3d 118, 125 (N.H. 2010)).  Thus, notwithstanding that the circumstances of the identification may have been suggestive, the Court concluded that the deterrence rationale that underlies the whole Biggers line had no application.  Perry, 132 S. Ct. at 726.

In my view, therefore, Perry is no per se bar to finding plain error here.  Perry is instead best read to affirm what the Court had said before about when the Biggers test must be applied. Due process requires the Biggers review for reliability "when law enforcement officers use an identification procedure that is both suggestive and unnecessary."  Id. at 724.  For it is only when the government is responsible for the suggestiveness that due process requires an inquiry into the reliability of the identification.

**III.**

With Perry out of the way, the issue reduces to the following.  When, if ever, should an in-court identification be subject to Biggers review by virtue of the suggestive attributes of what happened in the courtroom itself? Substantial precedent shows that a government-orchestrated, in-court identification may, in some circumstances, be so suggestive as to trigger Biggers review, even absent a prior, out-of-court suggestive prompt.  See, e.g.,

-43-

<u>United States</u> v. <u>Greene</u>, 704 F.3d 298, 307-08 (4th Cir. 2013); <u>United States</u> v. <u>Rogers</u>, 126 F.3d 655, 657-58 (5th Cir. 1997) ("[I]t is obviously suggestive to ask a witness to identify a perpetrator in the courtroom when it is clear who is the defendant."); <u>United States</u> v. <u>Hill</u>, 967 F.2d 226, 232 (6th Cir. 1992); <u>United States</u> v. <u>Rundell</u>, 858 F.2d 425, 426 (8th Cir. 1988); <u>see also</u> <u>United States</u> v. <u>Beeler</u>, 62 F. Supp. 2d 136, 140-45 (D. Me. 1999) (suppressing, in advance of trial, in-court identification because it would be impermissibly suggestive and unreliable). And the government does not argue otherwise.

The majority contends, however, that such review is required only when the in-court identification involves special features of concern. The majority then notes that, here, the prosecutor's in-court questions or comments did not expressly draw the witness's attention to the defendant or directly suggest the hoped-for result. <u>See</u> <u>Greene</u>, 704 F.3d at 307-08. Nor was the defendant in this case of a different race or gender from all other persons in the courtroom or at counsel table. <u>See</u> <u>United States</u> v. <u>Archibald</u>, 734 F.2d 938, 941 (2d Cir. 1984). But, as I will explain, the government still orchestrated this identification to occur in circumstances that clearly were unnecessarily suggestive -- at least when the circumstances are considered in their totality.

As to orchestration, the challenged in-court identification did not just happen. Instead, the prosecutor brought it about through a cooperating witness, José Vega-Torres, who had been prepped and promised (according to his own testimony) that his cooperation would protect his wife from prosecution. And Vega was asked to provide testimony that was -- the government concedes -- the whole of the case against Correa.

As to suggestiveness, the prosecutor asked Vega to identify Correa only on Vega's second day of testifying, after the lunch break. Thus, the prosecutor asked Vega to make the identification only after Vega had spent a day and a half on the stand, with Correa -- the only male defendant -- seated before him at counsel table. And during Vega's day-plus time on the stand, defense counsel rose to object at numerous points. By the time of the identification, then, the object of the prosecution would have been obvious.

The majority points out that the government did not put Correa at counsel table. He took that seat on his own, as it was his right to do. But the government still chose to seek the identification from Vega fully aware that the defendant was so positioned -- and thus fully aware that Vega would be asked to identify Correa at a moment when he was at that table and after Vega had observed him there at substantial length. Indeed, it is fair to say the longest look that Vega -- by his own account --

ever had of Correa was during the time the government had asked Vega to appear on the stand prior to asking him to make the identification. Cf. United States v. Montgomery, 150 F.3d 983, 992 (9th Cir. 1998) ("permitting [the witness] to view [the defendant] in the courtroom the day before the witness was scheduled to testify" found to be a "suggestive procedure[]").

In these circumstances, I do not believe Correa is overstating things in contending that the government's presentation of the identification was "the functional equivalent of the one person show-up, a classically suggestive method of identification in which an eyewitness is confronted with only one option to cho[o]se from." See Greene, 704 F.3d at 307-08 (4th Cir. 2013); Hill, 967 F.2d at 232; Beeler, 62 F. Supp. 2d at 144-45; Commonwealth v. Crayton, 21 N.E.3d 157, 166 (Mass. 2014) ("Where, as here, a prosecutor asks a witness at trial whether he or she can identify the perpetrator of the crime in the court room, and the defendant is sitting at counsel's table, the in-court identification is comparable in its suggestiveness to a showup identification."). And, for that reason, I believe it clear that the identification's reliability must be tested under the Biggers factors.

After all, the government cannot show that these suggestive means were somehow "necessary." See Perry, 132 S. Ct. at 724 (finding "[c]rucial" to the Court's allowance of a

suggestive procedure in <u>Stovall</u> that it was a "necessity"); <u>Stovall</u>, 388 U.S. at 302 (finding a suggestive encounter necessary because "[n]o one knew how long [the hospitalized witness] might live" and thus "the police followed the only feasible procedure"); <u>United States ex rel. Kirby</u> v. <u>Sturges</u>, 510 F.2d 397, 403-04 (7th Cir. 1975) (Stevens, J.) (concluding, despite there being "no evidence of bad faith or excessive zeal to obtain a conviction," that a showup was "unnecessarily suggestive" because it was "not justified by any exigent circumstances, or even by any minimal showing of inconvenience"). True, as a general matter, the prosecution is entitled to present its case in the order it thinks best. But that standard feature of the way that we organize criminal trials does not mean it was necessary for the government to elicit the identification of Correa in the highly suggestive way that it chose.

The government could have relied on an identification by Vega that he made out of court through a non-suggestive means. In fact, the government introduced photo arrays showing that Vega had made out-of-court identifications of other alleged conspirators. Yet the government chose not to pursue that same approach at trial in Correa's case. And, even if the government wished to proceed with an in-court identification, the government acknowledged at oral argument that there were mitigating measures that could have been taken in court but were not. See <u>Beeler</u>, 62 F. Supp. 2d at

-47-

144-45 (noting "that a number of courts have reasoned that the preferred remedy for a suggestive in-court identification is not, necessarily, the suppression of the identification but an in-court lineup or some other protective measure to ensure the fairness of the identification and cross-examination of the eyewitness"); see also Kirby, 510 F.2d at 405-06 (describing "unanimity among scholars" that "evidence of, or derived from, a showup identification should be inadmissible unless the prosecutor can justify his failure to use a more reliable identification procedure").

I recognize that, in one respect, the situation is different when, unlike here, an in-court identification is made only after a prior, suggestive out-of-court identification. In that type of case, the jurors do not have the opportunity to witness the complained of suggestive circumstance themselves. Here, by contrast, the jurors did, as they obviously watched what happened in court. But, that does not show that an in-court identification of this sort must be left to the jury to weigh. For while in theory the jurors were well-positioned to evaluate the suggestiveness of what they saw, in fact the jurors were exposed to a seemingly certain identification made in a very suggestive setting. In other words, the fact that the jury witnessed this particular identification does not solve the problem. It potentially is the problem. See Kampshoff, 698 F.2d at 585 ("There

can be no reasonable doubt that inaccurate eyewitness testimony may be one of the most prejudicial features of a criminal trial. Juries, naturally desirous to punish a vicious crime, may well be unschooled in the effects that the subtle compound of suggestion, anxiety, and forgetfulness in the face of the need to recall often has on witnesses." (footnote omitted)).

In light of the "obvious[] suggestive[ness]" of the circumstances in which the government chose to elicit the identification, I conclude -- as the Fifth Circuit did more than a decade ago in considering an unobjected-to, in-court identification -- that even on plain error review, the Biggers test applies. See Rogers, 126 F.3d at 658. In that case, the Fifth Circuit confronted circumstances not unlike those at issue here and undertook such reliability review because the witness had been asked to make the identification "when it [was] clear who [was] the defendant." Id. Rogers explained that the witness initially provided testimony without making any identification but was then called back to the stand the next day to identify the defendant, the only black man at counsel table, as the culprit.[27] Id. at 657-

---

[27] The prosecutor identified "something odd" in the witness's demeanor during her initial testimony and afterwards had the FBI case agent approach her. Rogers, 126 F.3d at 657. The witness told the agent during that conversation that she recognized the defendant as the culprit and the government then asked -- and was granted permission -- to recall her to the stand. Id. And while the defendant's counsel objected to the witness being recalled, counsel did not object to her identification after she took the stand. Id. at 657-58.

58 & n.1. And while the Fifth Circuit noted that the concern about suggestiveness was "heightened" in that case because the witness was of a different race from the defendant, id. at 658, here that same concern is heightened by the duration of the witness's pre-identification testimony and the gender of the defendant relative to the other defendant at counsel table.

In both cases, therefore, the key fact is the ultimate one that the Biggers line suggests to me should matter: each time, it was obvious who the defendant was when the prosecution asked the witness to make the in-court identification. So although I grant that there is no case finding plain error on facts exactly like these, it seems to me that the relevant inquiry into suggestiveness that Biggers requires yields an answer no less obvious in Correa's case than the Fifth Circuit found in Rogers. And given that "the 'plainness' of [an] error can depend on well-settled legal principles as much as well-settled legal precedents," United States v. Brown, 352 F.3d 654, 664 (2d Cir. 2003) (emphasis omitted), I do not believe counsel's failure to object at trial should shield this in-court identification from the scrutiny that Biggers plainly requires in comparably suggestive circumstances.

**IV.**

In consequence of the unnecessarily suggestive means that the government used, I believe we must apply the Biggers factors to test whether Vega's identification was corrupted by the

-50-

suggestiveness of the setting.  See 409 U.S. at 199-200.[28]  And it is plain to me that, after doing so, we should have no confidence that Vega's identification rested on his recollection of Correa's appearance from prior encounters -- to the extent they qualified as "encounters" -- rather than from the suggestive circumstances in which the prosecutor asked Vega to make his choice.

Vega testified to viewing Correa, known to him in the conspiracy as "El Don," on only three occasions, each of which occurred long ago.  The only physical interaction was brief, at most lasting a matter of minutes.  And the encounters between the two men could be described, at best, as indirect: putting luggage in a car, a sighting through a car window, and finally, Vega's glimpse of "El Don" handling baggage on the tarmac while Vega waited in the airport from what must have been a substantial distance.  The witness never purported to have had a personal relationship with the defendant.  Nor did Vega offer any previous description that matched Correa's.

_____

[28] The factors to consider in evaluating whether the identification is reliable despite the unnecessary suggestiveness of the identification procedure include "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." Biggers, 409 U.S. at 199-200.  Of course, as the majority notes, courts need not apply these factors to test the reliability of an identification not orchestrated by the government to occur in an unnecessarily suggestive way. See Maj. Op. 24 n.17.

Furthermore, Vega claimed to have interacted with Correa only in 2006, while Vega's in-court identification of Correa occurred five years later, in 2011. Biggers suggested, however, that a far shorter, seven-month gap between sighting and identification counted against the identification's reliability. Id. at 201. And while we have sometimes permitted lengthy time gaps, we have not been so forgiving when the encounters were as fleeting and indirect as these. See, e.g., United States v. Flores-Rivera, 56 F.3d 319, 331 (1st Cir. 1995) (excusing seven-year time gap when "other reliability criteria were sufficiently persuasive").

Vega did not appear to hesitate in identifying Correa from the stand. But certainty on the part of the witness does not reveal much. See United States v. Jones, 689 F.3d 12, 18 (1st Cir. 2012) ("[L]ack of confidence is certainly a reliable warning sign, while the presence of confidence is probably closer to a neutral factor."). Such apparent certainty may result from the suggestive circumstances, and certainty after suggestive prompting cannot show reliability. See, e.g., Raheem v. Kelly, 257 F.3d 122, 139 (2d Cir. 2001) (finding it "difficult to view [a witness's] certainty as an indicator of reliability independent of the suggestive lineup").

Not surprisingly, therefore, the government does not argue that the Biggers factors support the identification's

reliability.  This identification, which should have triggered the <u>Biggers</u> test, clearly cannot survive it.

**V.**

That leaves the issue of prejudice.  <u>See</u> <u>United States</u> v. <u>Delgado-Marrero</u>, 744 F.3d 167, 184 (1st Cir. 2014) (describing the "infrequent case[] in which reversal is warranted" under the plain error standard of review); <u>see also</u> <u>Rogers</u>, 126 F.3d at 658-60 (finding error in the admission of an obviously suggestive and unreliable in-court identification, but holding error harmless in light of overwhelming evidence of guilt).  But here, the prejudice is clear.

The government conceded that Vega's testimony provided the only direct evidence that linked Correa to this conspiracy. And a review of the record also reveals many -- in some cases, inexplicable -- weaknesses in the government's case. These weaknesses include: the inability of the testifying investigative agent to explain how and why Correa was identified as a member of the conspiracy; the evidence suggesting Correa worked for a different baggage handling company than any of the other co-conspirators tasked with the same alleged role in the conspiracy; the testimony suggesting Vega made out-of-court identifications of many of the co-conspirators without apparently making an out-of-court identification of Correa; another testifying co-conspirator's non-recognition of Correa; and the failure of the government to

call any co-conspirators -- despite having entered into plea agreements with them -- who had dealt personally with Correa.

There is some corroborating evidence of Correa's involvement in the conspiracy: a resume listing his email address as including the words "El Don" and his wife's ownership of the same car Vega testified that "El Don" had at Vega's one interaction with him. But that evidence itself traces back only to Vega's testimony. Thus, the other evidence against Correa gives no assurance that, even absent the identification by Vega, the jury would have convicted. See, e.g., United States v. Casas, 356 F.3d 104, 123-24 (1st Cir. 2004) (vacating conviction of defendant Cunningham when -- apart from improper testimony -- only evidence of involvement with conspiracy was his identification by three co-conspirators with whom he had few contacts).

This case, then, is like those that have given courts the most pause about the due process implications of admitting in-court identifications. The problematic identification here was essential to the government's case. See Raheem, 257 F.3d at 142 ("The identification testimony of [the witnesses] clearly bore on an essential issue, the identity of the shooter. And that testimony was crucial to the prosecution's case, for the State presented no evidence other than the testimony of [the witnesses] to tie [the defendant] to the events."); Kampshoff, 698 F.2d at 588 ("[A]ll told, absent the identification testimony, the evidence against

Kampshoff is simply not overwhelming."); cf. United States v. Williams, 436 F.2d 1166, 1168 (9th Cir. 1970) ("[W]here the question of guilt or innocence hangs entirely on the reliability and accuracy of an in-court identification, the identification procedure should be as lacking in inherent suggestiveness as possible.").

Still, to succeed on plain error review, the defendant must make one more showing. He must demonstrate that the error "seriously impaired the fairness, integrity, or public reputation of the judicial proceedings." De León-Quiñones, 588 F.3d at 753 (quoting Griffin, 524 F.3d at 76). But that additional requirement poses no obstacle for Correa. When the government introduces an unnecessarily suggestive in-court identification on which nearly the whole of the prosecution depends, it seems to me clear that this last part of the plain error test is met.

## VI.

I recognize the concern about opening the door to other successful attacks on in-court identifications. But not every in-court identification is similarly staged, with the cooperating witness prepped to testify, brought to the stand, and then prompted to give an identification of the one male defendant at counsel table and then only after having provided a day and a half of testimony. Not every in-court identification rests on minimal contacts that occurred long ago and thus plainly lacks sufficient

-55-

indicia of reliability to survive the <u>Biggers</u> test. Not every prosecution rests so heavily on an in-court identification this shaky. And fewer still are the prosecutions that are so dependent on in-court identifications that share these concerning attributes. I thus do not think it too much to require the government to make the case against Correa on evidence less likely to mislead the jury in this needless way. And, in my view, the Due Process Clause requires that same conclusion.

I respectfully dissent.