Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us.  Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE

**2019 CO 19**

**No. 16SC75, *Garner v. People*—Eyewitnesses—Identification Evidence and
Procedures—In-Court Identification.**

The supreme court reviews whether due process or Colorado rules of evidence
required the exclusion of victim-witnesses' in-court identifications of the defendant,
where each witness had failed to identify the defendant in a photographic array before
trial and almost three years had elapsed between the crime and the confrontations.  The
supreme court holds that where an in-court identification is not preceded by an
impermissibly suggestive pretrial identification procedure arranged by law enforcement,
and where nothing beyond the inherent suggestiveness of the ordinary courtroom setting
made the in-court identification itself constitutionally suspect, due process does not
require the trial court to prescreen the identification for reliability.  Because the defendant
alleges no impropriety regarding the pretrial photographic arrays, and the record reveals
nothing unusually suggestive about the circumstances of the witnesses' in-court
identifications, the supreme court holds that the in-court identifications did not violate
due process.  The court further holds that the defendant's evidentiary arguments are

unpreserved and that the trial court's admission of the identifications was not plain error under CRE 403, 602, or 701. Accordingly, the supreme court affirms the judgment of the court of appeals.

# The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

## 2019 CO 19

## Supreme Court Case No. 16SC75
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 12CA2540

### Petitioner:

James Joseph Garner,

v.

### Respondent:

The People of the State of Colorado.

### Judgment Affirmed
*en banc*
March 18, 2019

**Attorneys for Petitioner:**
Megan A. Ring, Public Defender
Inga K. Nelson, Deputy Public Defender
    *Denver, Colorado*

**Attorneys for Respondent:**
Philip J. Weiser, Attorney General
Jillian J. Price, Assistant Attorney General
    *Denver, Colorado*

**Attorneys for Amicus Curiae The American Psychological Association:**
Wilmer Cutler Pickering Hale and Dorr LLP
Michael J.P. Hazel
    *Denver, Colorado*

Wilmer Cutler Pickering Hale and Dorr LLP
David W. Ogden
Daniel S. Volchok
Kevin M. Lamb
 *Washington, D.C.*

**Attorneys for Amicus Curiae The Innocence Project:**
Johnson & Klein, PLLC
Eric K. Klein
Amy D. Trenary
 *Boulder, Colorado*

**JUSTICE MÁRQUEZ** delivered the Opinion of the Court.
**JUSTICE HART** dissents, and **JUSTICE HOOD** and **JUSTICE GABRIEL** join in the dissent.

¶1 Eyewitness identifications are extremely powerful evidence. "[T]here is almost *nothing more convincing* than a live human being who takes the stand, points a finger at the defendant, and says 'That's the one!'" *Watkins v. Sowders*, 449 U.S. 341, 352 (1981) (Brennan, J., dissenting) (quoting Elizabeth F. Loftus, *Eyewitness Testimony* 19 (1979)). But such evidence is also fallible. Indeed, "the annals of criminal law are rife with instances of mistaken identification." *United States v. Wade*, 388 U.S. 218, 228 (1967). Precisely because identification testimony is so persuasive, a mistaken identification can lead to a wrongful conviction.

¶2 Criminal defendants therefore have access to certain safeguards at trial to test the reliability of identification evidence, including the right to counsel and the opportunity to cross-examine prosecution witnesses. The U.S. Supreme Court has also recognized "a due process check on the admission of eyewitness identification, applicable when the police have arranged suggestive circumstances leading the witness to identify a particular person as the perpetrator of a crime." *Perry v. New Hampshire*, 565 U.S. 228, 232 (2012). Specifically, in *Neil v. Biggers*, the Court held that where the State seeks either to admit evidence of a resulting out-of-court identification or to elicit a live identification from the witness at trial, due process requires the trial court to assess whether, under the totality of the circumstances, the identification is nevertheless reliable. 409 U.S. 188, 198–99 (1972).

¶3 Here, the People charged James Garner for a bar shooting that injured three brothers. The People's case hinged on the brothers' live identifications of Garner at trial almost three years later, though none of them could identify Garner as the shooter in an

3

earlier photographic array. The core question before us is whether, in these circumstances, *Biggers* required the trial court to assess the reliability of the brothers' first-time in-court identifications before allowing them in front of the jury.

¶4 Garner argues that particularly given the brothers' inability to identify him before trial, their in-court identifications were the product of impermissibly suggestive circumstances, and the trial court should have suppressed them under both *Biggers* and the Colorado Rules of Evidence. The People respond that where an in-court identification does not stem from a constitutionally defective out-of-court identification procedure, the court need not screen the in-court identification for reliability. Instead, any questions of reliability are for the jury to weigh.

¶5 We hold that where an in-court identification is not preceded by an impermissibly suggestive pretrial identification procedure arranged by law enforcement, and where nothing beyond the inherent suggestiveness of the ordinary courtroom setting made the in-court identification itself constitutionally suspect, due process does not require the trial court to assess the identification for reliability under *Biggers*. Because Garner alleges no impropriety regarding the pretrial photographic arrays, and the record reveals nothing unusually suggestive about the circumstances of the brothers' in-court identifications, we hold that the in-court identifications did not violate due process. We further hold that Garner's evidentiary arguments are unpreserved and that the trial court's admission of the identifications was not plain error under CRE 403, 602, or 701. Accordingly, we affirm the judgment of the court of appeals.

4

# I. Facts and Procedural History

¶6     Near closing time at a Denver bar, two groups were celebrating birthdays. Christian Adame-Diaz was celebrating with his friend and his two brothers, Roberto and Arturo. The defendant, James Garner, was celebrating with his girlfriend and a few others. A fight broke out between the two groups. Someone pulled out a gun and fired six shots, injuring all three brothers. Following the shooting, Garner's group fled. Police recovered from the scene a pair of glasses splattered with Garner's blood, and a cell phone belonging to his girlfriend.

¶7     The People charged Garner with attempted murder of each brother; first-degree assault of Christian and Arturo; possession of a weapon by a previous offender;[1] and crime of violence sentence enhancers. The defense maintained that although Garner was at the bar on the night of the shooting, he was not the gunman.

¶8     During their investigation, police presented each brother with a photographic array that included Garner. Although Christian was able to identify Garner as someone present at the bar the night of the shooting, none of the brothers identified Garner as the gunman.

¶9     Despite failing to identify Garner in the pretrial photo arrays, all three brothers positively identified him almost three years later at trial as the shooter. Roberto testified first. When asked whether he saw "anybody . . . in the courtroom . . . who shot at [him]

_____

[1] The People later dismissed this charge.

on that particular evening," Roberto pointed at Garner and identified the color of his shirt. Roberto said the shooter's face was something he would never forget. The following morning, defense counsel moved to strike Roberto's in-court identification of Garner "as an impermissible one-on-one show[-]up identification, not comporting with the factors that are required." The trial court took the issue under advisement.

¶10 Arturo was the next brother to testify. When asked how long he had stayed at the bar that night, Arturo spontaneously identified Garner, saying, "[U]ntil this individual here fired at us. I don't want to see this guy I remember with the gun." Arturo said he was "a hundred percent sure that it was him." Defense counsel objected to "the unduly suggestive nature of th[e] one-on-one identification," but did not specify what made the in-court identification suggestive. The trial court overruled the objection.

¶11 Christian likewise spontaneously identified Garner in the courtroom. While testifying about the events leading up to the shooting, Christian pointed at Garner and said, "[H]im, James that's here, pushed [Roberto] against the chairs. When he fell on top of the chairs and tables, he took out his gun and started shooting my brother." Christian was positive that Garner was the gunman. Defense counsel again objected "as to a one-on-one prejudicial show-up lineup," and the trial court again overruled the objection.

¶12 Throughout trial, defense counsel questioned the reliability of the brothers' identification testimony. In her opening statement, counsel asked the jury to note how the brothers' descriptions of the shooter initially conflicted but began to cohere over time:

> [T]he . . . brothers . . . give different descriptions of what they think the man looked like. . . . None of them describe a person with facial hair. Yet later they meet with the district attorneys and the detective at the bar, and

6

suddenly all of their descriptions kind of start to line up a little bit more because now they are all describing a guy with facial hair.

¶13 Counsel highlighted these and many other discrepancies in the brothers' descriptions of the shooter through cross-examination, eliciting differences in the type, color, and detail of the shooter's clothing, and whether he had facial hair or wore glasses.

¶14 Defense counsel also confronted each brother with his earlier failure to identify Garner as the shooter in a photographic array. For example, Christian acknowledged on cross-examination that when he saw Garner in the photo array, he told the detective, "He was there but he was not the shooter." And counsel engaged in the following exchange with Roberto:

Q. Now, you spoke with [the detective] again . . . so that you could look at the [photo] lineup and see if you could find the man you'll never forget?

A. Yes.

Q. Which you did not?

A. No, I didn't do it.

¶15 During closing argument, defense counsel again sought to undermine the brothers' in-court identifications. She retraced for the jury how "[e]veryone's initial description of the shooter [wa]s different," and how the brothers' descriptions changed over time. Counsel also contrasted the brothers' inability to identify Garner in the photographic arrays with their certainty that he was the shooter when they saw him in court: "They can't identify James Garner at . . . all, but when he's sitting in this chair, the one with the arrow over it, that's when they can say they're sure."

¶16 The jury convicted Garner of first-degree assault of Christian; second-degree

7

assault of Arturo; and the lesser-included offenses of attempted reckless manslaughter of Christian and Arturo. The jury acquitted Garner of all attempted murder charges and of all the lesser-included charges against Roberto.

¶17 Garner appealed his convictions, arguing, as relevant here, that the admission of the brothers' in-court identifications violated his right to due process under the state and federal constitutions, and the requirements of CRE 403, 602, and 701.

¶18 The court of appeals rejected these contentions. *People v. Garner*, 2015 COA 175, __ P.3d __. The court reasoned that in *Neil v. Biggers*, the U.S. Supreme Court articulated a test for "the exclusion of impermissible pretrial identifications and the in-court identifications that follow them." *Garner*, ¶ 11. The harm to be avoided, the division explained, is the risk that "the in-court identification is the product of the illegal lineup and not the observation of the defendant's wrongful act." *Id.* at ¶ 10. The court recited the factors identified in *Biggers* that a trial court should consider when assessing the reliability of an identification that follows an impermissibly suggestive confrontation procedure: (1) the witness's opportunity to view the accused at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description; (4) the witness's level of certainty at the confrontation; and (5) the length of time between the crime and the confrontation. *Id.* at ¶ 11 (citing *Biggers*, 409 U.S. at 199).

¶19 The court of appeals next observed that the majority of courts have declined to extend *Biggers* to in-court identifications that do not follow unlawful pretrial identifications. *Id.* at ¶ 12. The court also observed that Colorado has not applied "[t]he exclusionary rule . . . to in-court identifications alleged to be suggestive simply because

of the typical trial setting." *Id.* at ¶ 13 (quoting *People v. Monroe*, 925 P.2d 767, 775 (Colo. 1996)).

¶20 Relying on these principles, the court noted that although Garner's counsel "objected to . . . the identifications on the basis that they were one-on-one show-ups," she offered no specific argument identifying the "constitutionally impermissible and suggestive circumstances other than the fact that the[] identifications occurred in the courtroom setting." *Id.* at ¶ 19. The court reasoned that, although "relevant and certainly grist for cross-examination," the brothers' inability to identify Garner as the shooter prior to trial did not, as a matter of law, "preclude [them] from making an identification upon seeing [Garner] in court." *Id.* at ¶ 21. The court explained that the brothers' previous failure to identify Garner went to the weight of their in-court identification testimony, rather than its admissibility. *Id.* at ¶¶ 21–22.

¶21 The court observed that "[e]ach identification was done in the presence of the jury," and that "defense counsel extensively cross-examined and impeached each of the brothers with their prior inconsistent statements and inability to identify defendant as the shooter from the photo lineup." *Id.* at ¶ 23. Thus, the court concluded, Garner "was given a full and fair opportunity to cross-examine each of the in-court identifications," and his right to due process was not violated. *Id.*

¶22 The court also summarily rejected Garner's "bare evidentiary arguments," noting that defense counsel had not made specific objections at trial under CRE 403, 602, or 701. *Id.* at ¶ 23 n.2. It concluded the trial court had not, in any event, abused its discretion under those rules in admitting the in-court identifications. *Id.*

9

¶23    We granted Garner's petition for a writ of certiorari to decide whether the in-court identifications were admitted in error.[2]

## II. Analysis

¶24    Garner argues that the admission of the brothers' first-time in-court identifications violated his rights to due process and a fair trial. Importantly, he does not allege that the pretrial identification procedures were improper. Instead, he contends that the brothers' first-time in-court identifications were the product of impermissibly suggestive circumstances, particularly given the brothers' inability to identify Garner as the shooter in the pretrial photographic arrays. Therefore, he argues, the trial court was required to assess the reliability of these in-court identifications under the *Biggers* test before admitting them. Garner also contends the trial court should have excluded the identifications under CRE 403, 602, and 701, though he failed to make specific objections under those rules at trial.

¶25    The People respond that in-court identifications not preceded by improper pretrial identification procedures do not implicate a defendant's right to due process. The People observe that in-court identification procedures historically have not been cause for concern, and point out that in *Perry v. New Hampshire*, the U.S. Supreme Court held that the *Biggers* reliability test is not required for identifications that were not procured under

---

[2] We granted certiorari to review the following issue:

1. Whether the court of appeals erred in affirming the trial court's admission of the in-court identifications of the defendant.

10

suggestive circumstances arranged by law enforcement. Although they acknowledge that all in-court identifications entail some element of suggestion, they contend that any inherent suggestiveness of the courtroom setting is not attributable to law enforcement. The People thus argue the trial court was not required to prescreen the brothers' in-court identifications for reliability under the *Biggers* factors; rather, the reliability of their identification testimony was for the jury to weigh. Alternatively, the People argue that even under the *Biggers* factors, the identifications were sufficiently reliable to be admitted. Finally, the People contend that the trial court did not plainly err by failing, sua sponte, to exclude the challenged identifications under CRE 403, 602, and 701.

¶26 We begin our analysis by tracing the U.S. Supreme Court's development of the test articulated in *Biggers*. We then observe that in the wake of *Biggers*, courts have been divided on whether the *Biggers* reliability analysis applies to an in-court identification not preceded by an improper out-of-court identification procedure. We also note that in Colorado, we have recognized that certain in-court identifications might raise due process concerns, but we have declined to require prescreening of identifications alleged to be suggestive based merely on the ordinary courtroom setting.

¶27 Next, we turn to a discussion of the U.S. Supreme Court's decision in *Perry*. There, the Court held that out-of-court identifications that are not a product of suggestive circumstances arranged by law enforcement do not require judicial prescreening for reliability under *Biggers*. Though the Supreme Court in *Perry* did not squarely address whether *Biggers* applies to first-time in-court identifications, its reasoning has significantly reshaped that debate: the clear majority of courts to consider the issue since

11

*Perry* have concluded that *Biggers* does not require trial courts to screen first-time in-court identifications for reliability. These courts have concluded that for defendants identified for the first time in court, the ordinary safeguards of the trial process are sufficient to satisfy due process, and the reliability of the identification testimony is for the jury to weigh.

¶28 Relying on the Supreme Court's reasoning in *Perry*, we hold that where an in-court identification is not preceded by an impermissibly suggestive pretrial identification procedure arranged by law enforcement, and where nothing beyond the inherent suggestiveness of the ordinary courtroom setting made the in-court identification itself constitutionally suspect, due process does not require the trial court to assess the identification for reliability under *Biggers*. Because Garner does not allege that the pretrial identification procedures were improper, and the record reveals nothing unusually suggestive about the circumstances surrounding the brothers' in-court identifications, we hold that their admission did not violate due process. We further hold that the trial court's admission of the identifications was not plain error under CRE 403, 602, or 701. Accordingly, we affirm the judgment of the court of appeals.

## A. Suggestive Out-of-Court Identifications and Subsequent In-Court Identifications

¶29 Historically, the questionability of eyewitness identification testimony went to the weight of such evidence and not its admissibility. But in a trilogy of cases decided in 1967, *United States v. Wade*, 388 U.S. 218 (1967), *Gilbert v. California*, 388 U.S. 263 (1967), and *Stovall v. Denno*, 388 U.S. 293 (1967), the U.S. Supreme Court held that in certain

12

circumstances, an out-of-court identification obtained by means of improper police procedures, as well as any subsequent in-court identification tainted by the original improper one, should be excluded from the jury's consideration altogether.

¶30    In both *Wade* and *Gilbert*, witnesses identified the defendant at a post-indictment lineup conducted in the absence of the defendant's counsel.  *Wade*, 388 U.S. at 219–20; *Gilbert*, 388 U.S. at 269–70. In *Wade*, the Court considered whether the witnesses' subsequent courtroom identifications of the defendant at trial should be excluded from evidence. 388 U.S. at 219–20. In *Gilbert*, the prosecution sought to offer not only the witnesses' courtroom identifications, but also testimony relating their initial identifications at the pretrial lineup. 388 U.S. at 271.

¶31    In both cases, the Court held that the Sixth Amendment right to counsel applies to a post-indictment lineup because it is a critical stage requiring the presence of counsel to preserve the defendant's basic right to a fair trial.  *Wade*, 388 U.S. at 236–37; *accord Gilbert*, 388 U.S. at 272.  In so doing, the Court expressed concern about "the high incidence of miscarriage of justice from mistaken identification" resulting from "the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification." *Wade*, 388 U.S. at 228.  The Court thus envisioned the presence of defense counsel as the antidote to potentially suggestive pretrial identification procedures—both to avert prejudice at the lineup itself, and to preserve the accused's meaningful ability to attack the credibility of the witness's resulting courtroom identification at trial.  *See id.* at 228–37.

¶32    The Court then turned to the proper remedy for the Sixth Amendment violations.

13

As to the pretrial identification testimony the State sought to admit in *Gilbert*, the Court reasoned that such evidence was the "direct result of the illegal lineup 'come at by exploitation of []the primary[] illegality,'" and only the sanction of automatic exclusion could assure law enforcement authorities' respect for the accused's right to presence of counsel. 388 U.S. at 272–73 (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)).

¶33 But as to the in-court identifications in both *Wade* and *Gilbert*, the Court reasoned that a per se exclusionary rule would be unjustified. *Wade*, 388 U.S. at 240; *accord Gilbert*, 388 U.S. at 272. Instead, the Court held that the prosecution should be given an opportunity to establish by clear and convincing evidence that the witnesses' in-court identifications were based upon observations of the defendant other than during the lineup. *Wade*, 388 U.S. at 240; *Gilbert*, 388 U.S. at 272. The relevant question, the Court explained, was "[w]hether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wade*, 388 U.S. at 241 (quoting John MacArthur Maguire, *Evidence of Guilt* 221 (1959)). An in-court identification free from the taint of any improper pretrial procedure could thus properly go to the jury.

¶34 Finally, in *Stovall*, the Court held that the exclusionary rule identified in *Wade* and *Gilbert* did not apply retroactively. *Stovall*, 388 U.S. at 296–301. But in setting forth its reasons for giving those cases only prospective application, the Court made clear that a defendant could nevertheless seek to prove—independent of any Sixth Amendment violation—that a police identification procedure was so "unnecessarily suggestive and

14

conducive to irreparable mistaken identification" as to violate his Fourteenth Amendment right to due process. *Id.* at 301–02. There, the victim-witness identified Stovall in a pretrial show-up conducted in her hospital room, where Stovall stood handcuffed to an officer and was the only black man present. *Id.* at 295. Ultimately, the Court found no due process violation, concluding that the highly suggestive procedure in that case was justified because no one knew how long the victim-witness might live. *Id.* at 301–02. But importantly, *Stovall* recognized a distinct due process protection from unnecessarily suggestive out-of-court identification procedures.

¶35 A year later, in *Simmons v. United States*, the Supreme Court again considered the due process protection against suggestive pretrial identification procedures. 390 U.S. 377 (1968). In that case, the prosecution relied on in-court identifications that were allegedly tainted by the witnesses' previous exposure to a suggestive photographic array. *Id.* at 381–83. The *Simmons* Court acknowledged that the police's improper use of photographs can lead to a mistaken identification, and that a witness "thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of [any] subsequent . . . courtroom identification." *Id.* at 383–84. But the Court also noted that the danger of such a technique can be mitigated through cross-examination at trial. *Id.* at 384. Thus, it declined to prohibit the already widespread use of photographic arrays. *Id.* Instead, it held that a conviction based on in-court identification at trial following a pretrial identification by photograph will be set aside where the pretrial identification procedure was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Id.* The Court

ultimately declined to overturn Simmons' conviction, reasoning that the identification procedure used in that case was justified, and that there was little chance that it led to a misidentification. *Id.* at 384–85.

In *Biggers*, the Supreme Court synthesized its prior cases and established the approach to be used to determine whether due process requires suppression of an identification tainted by suggestive procedures. In that case, the prosecution's evidence included a victim-witness's testimony regarding her visual and voice identification of the defendant at a station-house show-up. 409 U.S. at 189, 195–96. In discerning the guidelines that had emerged from its prior cases, the Court emphasized that "the primary evil to be avoided [from a suggestive confrontation] is 'a very substantial likelihood of irreparable misidentification.'" *Id.* at 198 (quoting *Simmons*, 390 U.S. at 384). That likelihood of misidentification is what violates a defendant's right to due process, the Court explained; it is what justifies the exclusion of an in-court identification made in the wake of a suggestive out-of-court identification, as well as testimony about the out-of-court identification itself. *See id.*

However, the Court rejected the idea that unnecessary suggestiveness alone requires the exclusion of evidence. *Id.* Instead, the Court held that the proper question is "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Id.* at 199. The Court then outlined five factors to be considered in evaluating the likelihood of misidentification: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal;

16

(4) the level of certainty the witness demonstrated at the confrontation; and (5) the length of time between the crime and the confrontation. *Id.* at 199–200. Applying these factors, the Court concluded there was no substantial likelihood of misidentification, and the evidence was properly allowed to go to the jury. *Id.* at 201.

¶36 A few years later, in *Manson v. Brathwaite*, the Court clarified that the *Biggers* analysis applied to out-of-court confrontations conducted both pre- and post-*Stovall*. 432 U.S. 98, 114 (1977). The Court again rejected a per se rule of exclusion whenever law enforcement officers use improper identification procedures, reemphasizing that "reliability is the linchpin in determining the admissibility of identification testimony" and explaining that the five factors outlined in *Biggers* are to be weighed against the "corrupting effect of the suggestive identification itself." *Id.* at 111–14. Ultimately, the Court could not conclude that there was a substantial likelihood of misidentification in that case, and "[s]hort of that point, such evidence [was] for the jury to weigh." *Id.* at 116. The Court observed that it was "content to rely upon the good sense and judgment of American juries," noting that evidence containing "some element of untrustworthiness is customary grist for the jury mill," and that juries can "measure intelligently the weight of identification testimony that has some questionable feature." *Id.*

## B. First-Time In-Court Identifications

¶37 *Biggers* and *Brathwaite* did not answer the question before us today: whether a first-time in-court identification not preceded by an impermissibly suggestive pretrial identification procedure arranged by law enforcement should be subject to judicial screening under *Biggers*. In the wake of those cases, courts were split on the issue. Many

17

began to evaluate the reliability of such first-time in-court identifications under *Biggers*,[3] while still many others declined to do so.[4]

¶38    Courts that applied *Biggers* to such first-time in-court identifications tended to reason that *Biggers* was concerned primarily with preventing convictions based on mistaken identification, a rationale that supported applying its analysis to all eyewitness identifications, whether obtained before or during trial. *See, e.g.*, *United States v. Hill*, 967 F.2d 226, 232 (6th Cir. 1992) ("All of the concerns that underlie the *Biggers* analysis, including the degree of suggestiveness, the chance of mistake, and the threat to due process are no less applicable when the identification takes place for the first time at trial.").

¶39    Meanwhile, those courts that declined to apply *Biggers* reasoned primarily that unlike suggestive out-of-court identifications or in-court identifications tainted by earlier suggestive procedures, first-time in-court identifications take place before the jury and

---

[3] *See, e.g.*, *United States v. Douglas*, 489 F.3d 1117, 1126 (11th Cir. 2007); *United States v. Murray*, 65 F.3d 1161, 1168–69 (4th Cir. 1995); *United States v. Hill*, 967 F.2d 226, 232 (6th Cir. 1992); *United States v. Rundell*, 858 F.2d 425, 426–27 (8th Cir. 1988) (per curiam); *United States v. Aigbevbolle*, 772 F.2d 652, 654 (10th Cir. 1985); *Code v. Montgomery*, 725 F.2d 1316, 1319–20 (11th Cir. 1984) (per curiam); *Isom v. State*, 928 So. 2d 840, 846–49 (Miss. 2006); *In re R.W.S.*, 728 N.W.2d 326, 335–36 (N.D. 2007); *Commonwealth v. Silver*, 452 A.2d 1328, 1331–32 (Pa. 1982); *State v. Drawn*, 791 P.2d 890, 892–93 (Utah Ct. App. 1990); *Hogan v. State*, 908 P.2d 925, 928–29 (Wyo. 1995).

[4] *See, e.g.*, *United States v. Domina*, 784 F.2d 1361, 1367–69 (9th Cir. 1986); *Byrd v. State*, 25 A.3d 761, 767 (Del. 2011); *In re W.K.*, 323 A.2d 442, 444 (D.C. 1974); *White v. State*, 403 So. 2d 331, 335 (Fla. 1981); *Ralston v. State*, 309 S.E.2d 135, 136–37 (Ga. 1983); *State v. King*, 934 A.2d 556, 561 (N.H. 2007); *State v. Clausell*, 580 A.2d 221, 235–36 (N.J. 1990); *State v. Green*, 250 S.E.2d 197, 200 (N.C. 1978); *State v. Lewis*, 609 S.E.2d 515, 518 (S.C. 2005).

are subject to all the ordinary protections of a criminal trial:

> The concern with in-court identification, where there has been suggestive pretrial identification, is that the witness later identifies the person in court, not from his or her recollection of observations at the time of the crime charged, but from the suggestive pretrial identification. Because the jurors are not present to observe the pretrial identification, they are not able to observe the witness making that initial identification. The certainty or hesitation of the witness when making the identification, the witness's facial expressions, voice inflection, body language, and the other normal observations one makes in everyday life when judging the reliability of a person's statements, are not available to the jury during this pretrial proceeding. There is a danger that the identification in court may only be a confirmation of the earlier identification, with much greater certainty expressed in court than initially.

> When the initial identification is in court . . . [t]he jury can observe the witness during the identification process and is able to evaluate the reliability of the initial identification.

*United States v. Domina*, 784 F.2d 1361, 1368 (9th Cir. 1986) (internal citations omitted);

*accord Ralston v. State*, 309 S.E.2d 135, 136–37 (Ga. 1983); *State v. Lewis*, 609 S.E.2d 515, 518

(S.C. 2005).

¶40     Notably, even among the courts that deemed *Biggers* applicable to first-time

in-court identifications, many ultimately concluded that the typical courtroom

identification procedure posed no constitutional problem. *See, e.g.*, *Hogan v. State*, 908

P.2d 925, 929 (Wyo. 1995) ("[W]ithout more, the mere exposure of the accused to a witness

in the suggestive setting of a criminal trial does not amount to the sort of impermissible

confrontation with which the due process clause is concerned." (quoting

*Middletown v. United States*, 401 A.2d 109, 132 (D.C. 1979))).

¶41     Colorado was in this camp. We recognized in *People v. Walker* "that under some

circumstances an in-court identification may constitute an impermissible one-on-one

19

confrontation which is unnecessarily suggestive and conducive to irreparable mistaken identification." 666 P.2d 113, 119 (Colo. 1983) (likening a witness's first-time confrontation with a defendant in court to a one-on-one show-up). Although the details of the in-court identification procedure in *Walker* are somewhat ambiguous, the prosecutor apparently "told [the witness], and she assumed, that the defendant on trial was the shotgun-wielding robber." *Id.* at 120.

¶42   We later clarified, however, that exclusion is not required for "in-court identifications alleged to be suggestive simply because of the typical trial setting." *People v. Monroe*, 925 P.2d 767, 775 (Colo. 1996).[5] Distinguishing *Walker*, we noted several factors that made the identification procedure in *Monroe* comparatively less suspect, including that "[t]he prosecution made no improper remarks to the witness." *Monroe*, 925 P.2d at 774. We also emphasized the role of counsel in forestalling or exposing any suggestiveness in the identification and observed that special procedures may be appropriate in certain circumstances. *Id.* (acknowledging the trial court's discretion to order in-person lineups or Crim. P. 41.1 nontestimonial identifications).

---

[5] We observe that in several of our cases in this area, we seem to have conflated the Sixth Amendment and due process tests for admissibility, permitting a witness to make an in-court identification if based on an "independent source" distinct from any prior, unnecessarily suggestive identification procedure. *See, e.g.*, *Monroe*, 925 P.2d at 773–75; *Walker*, 666 P.2d at 119; *Gimmy v. People*, 645 P.2d 262, 270 (Colo. 1982); *People v. Mattas*, 645 P.2d 254, 261 (Colo. 1982); *People v. Thatcher*, 638 P.2d 760, 770 (Colo. 1981); *People v. Smith*, 620 P.2d 232, 238 n.11 (Colo. 1980); *People v. Bowen*, 490 P.2d 295, 298 (Colo. 1971); *Martinez v. People*, 482 P.2d 375, 377 (Colo. 1971).

## 1. *Perry v. New Hampshire*

¶43     More recently, in *Perry v. New Hampshire*, the Supreme Court considered whether *Biggers* requires a trial court to assess the reliability of an out-of-court identification obtained under suggestive circumstances *not* arranged by law enforcement. 565 U.S. 228 (2012). Although *Perry* did not directly answer whether *Biggers* applies to a first-time in-court identification, the Court's reasoning significantly reshaped the terms of that debate. We therefore discuss *Perry* and its rationale in some detail.

¶44     In *Perry*, police received a call that someone was trying to break into cars in the parking lot of an apartment building. 565 U.S. at 233. The responding officer encountered Perry in the lot, holding two car-stereo amplifiers. *Id.* A second officer remained with Perry while the first went upstairs to talk to a building resident who witnessed the break-in. *Id.* at 234. When the officer asked the resident for a description of the perpetrator, she spontaneously pointed to her window and said the person she had seen breaking into a car was standing in the parking lot next to the other officer. *Id.* The resident was later unable to identify Perry in a photographic array. *Id.* Perry moved to suppress evidence of the resident's out-of-court identification on due process grounds, arguing that it amounted to an impermissible one-person show-up. *Id.* at 234–35. The court denied the motion, reasoning that because the out-of-court identification did not result from an unnecessarily suggestive procedure manufactured by the police, the reliability of the testimony was for the jury to determine. *Id.* at 235.

¶45     After the jury convicted him of theft, Perry appealed, arguing that the suggestive

circumstances surrounding the identification were enough to trigger the trial court's duty to evaluate the identification for reliability under *Biggers* before allowing the jury to consider it. *Id.* at 236. Perry's argument hinged largely on the Court's statement in *Brathwaite* that "reliability is the linchpin in determining the admissibility of identification testimony." *Id.* at 240 (quoting *Brathwaite*, 432 U.S. at 114). If "reliability is the linchpin" of admissibility under the Due Process Clause, Perry argued, then the *Biggers* reliability analysis should be triggered regardless of whether police were responsible for creating the suggestive circumstances that marred the identification. *Id.* at 240–41.

¶46　　The Supreme Court rejected Perry's reading of its precedent, observing that he had "removed [the Court's] statement in *Brathwaite* from its mooring." *Id.* at 241. Read in context, the Court explained, its reference to reliability appeared in the Court's discussion of the appropriate remedy "*when the police use an unnecessarily suggestive identification procedure.*" *Id.* That remedy — the judicial screen for reliability — was adopted in lieu of an automatic exclusionary rule and, importantly, "comes into play only after the defendant establishes improper police conduct." *Id.* Far from suggesting that the risk of mistaken identification alone was enough to require judicial prescreening of identification evidence, the Court had made clear that the "purpose of the check . . . was to avoid depriving the jury of identification evidence that is reliable, *notwithstanding* improper police conduct." *Id.* (citing *Brathwaite*, 432 U.S. at 112–13).

¶47　　In other words, the Court explained, the *Biggers* reliability analysis is triggered "only when law enforcement officers use an identification procedure that is both

22

suggestive and unnecessary." *Id.* at 238–39. Revisiting the 1967 trilogy of cases and *Stovall*'s progeny, the Court observed that each case had involved improper procedures arranged by police. *See id.* at 237–38, 240–43. It discerned from those cases that "[a] primary aim of excluding identification evidence obtained under unnecessarily suggestive circumstances . . . is to deter law enforcement use of improper lineups, show[-]ups, and photo arrays in the first place." *Id.* at 241. The Court concluded that "[t]his deterrence rationale is inapposite in cases, like Perry's, in which the police engaged in no improper conduct." *Id.* at 242.

¶48    Importantly, the Court also expressed concern that to require trial courts to prescreen eyewitness evidence for reliability under *Biggers* "any time an identification is made under suggestive circumstances," *id.* at 240, would "open the door to judicial preview, under the banner of due process, of most, if not all, eyewitness identifications," *id.* at 243. This is because "most eyewitness identifications involve some element of suggestion. *Indeed, all in-court identifications do.*" *Id.* at 244. (emphasis added).

¶49    The Court recognized the fallibility of eyewitness identifications, but underscored that "[t]he Constitution . . . protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit." *Id.* at 237. Among the safeguards built into the adversarial system are the requirement that guilt be proven beyond a reasonable doubt, the right to counsel, and the right to confront and cross-examine the prosecution's witnesses. *Id.* at 246. Other safeguards, such as the rules of evidence, cautionary jury

23

instructions, and the ability to call expert witnesses to testify about the shortcomings of eyewitness testimony, provide additional protection against convictions based on questionable identification evidence. *Id.* at 247. Given the safeguards available in the ordinary criminal trial, the Court concluded that the Due Process Clause does not require a preliminary judicial inquiry into the reliability of eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement. *Id.* at 248.

## 2. After *Perry*

¶50 The *Perry* decision shifted the debate over whether *Biggers* requires judicial prescreening of first-time in-court identifications not preceded by suggestive out-of-court identification procedures. The clear majority of courts to consider the issue since *Perry* have concluded that, with respect to first-time in-court identifications, "the requirements of due process are satisfied in the ordinary protections of trial." *United States v. Whatley*, 719 F.3d 1206, 1216 (11th Cir. 2013).[6]

¶51 Tracking the reasoning in *Perry*, these courts have concluded that *Biggers* does not

---

[6] *See also, e.g.*, *United States v. Thomas*, 849 F.3d 906, 910–11 (10th Cir. 2017); *United States v. Hughes*, 562 F. App'x 393, 398 (6th Cir. 2014); *Young v. State*, 374 P.3d 395, 411–12 (Alaska 2016) (but announcing new, more protective due process test under state law for future cases); *Fairley v. Commonwealth*, 527 S.W.3d 792, 798–800 (Ky. 2017); *Galloway v. State*, 122 So. 3d 614, 664 (Miss. 2013*); State v. Ramirez*, 409 P.3d 902, 911–13 (N.M. 2017); *State v. Hickman*, 330 P.3d 551, 571–72 (Or. 2014); *cf. Benjamin v. Gipson*, 640 F. App'x 656, 659 (9th Cir. 2016) (rejecting ineffective assistance of counsel claim for failure to move to suppress first-time in-court identification because, given *Perry*, motion likely to have been unsuccessful).

apply to the type of first-time in-court identifications at issue here for three main reasons. First, because an ordinary in-court identification procedure involves no improper law enforcement action, exclusion of an identification made under such circumstances would serve no deterrent purpose and would thus be inappropriate under *Perry*. *See State v. Ramirez*, 409 P.3d 902, 912 (N.M. 2017) (concluding defendant's objections based on the suggestiveness of the courtroom setting "do nothing to establish that the alleged taint . . . if there was any, arose as a consequence of improper law enforcement influence"); *see also Whatley*, 719 F.3d at 1216.

¶52    Second, these courts reason that the *Perry* Court squarely rejected the notion that due process demands judicial prescreening of eyewitness identifications whenever they might be unreliable or the product of suggestion. *See*, *e.g.*, *Fairley v. Commonwealth*, 527 S.W.3d 792, 799 (Ky. 2017) ("Pointedly, the Court observed that many eyewitness identifications are problematic for any number of reasons including . . . a witness's poor vision, the stress of the encounter, personal grudges and cross-racial perceptions . . . ."). In so doing, the Court implicitly rejected the notion that due process requires judicial prescreening of all in-court identifications. *See id.*; *United States v. Thomas*, 849 F.3d 906, 910–11 (10th Cir. 2017); *Whatley*, 719 F.3d at 1215–16.

¶53    Finally, like *Perry*, these courts place their trust in the ordinary safeguards of trial that are at their height when an identification procedure takes place in open court. *See Young v. State*, 374 P.3d 395, 411–12 (Alaska 2016) ("An in-court identification . . . occurs in the presence of the judge, the jury, and the lawyers. The circumstances under which the identification is made are apparent. Defense counsel has the opportunity to

25

identify firsthand the factors that make the identification suggestive and to highlight them for the jury."); *see also Fairley*, 527 S.W.3d at 799–800; *Whatley*, 719 F.3d at 1217; *Ramirez*, 409 P.3d at 913.

¶54 Notably, several courts that had previously applied *Biggers* to first-time in-court identifications shifted course after *Perry*, concluding that the Supreme Court's reasoning undercut their earlier decisions. The Eleventh Circuit observed:

> When the Supreme Court made clear in *Perry* that *Simmons*, *Biggers*, and indeed "every case in the *Stovall* line" relied upon the involvement of law enforcement officials in the creation of the suggestive circumstances of the identification and that the Due Process Clause "does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement," the Court removed the foundation upon which [the Eleventh Circuit's prior cases] rested. And when the Supreme Court rejected the argument that the Due Process Clause requires judicial prescreening of all identifications obtained under suggestive circumstances and expressly disapproved the idea that in-court identifications would be subject to prescreening, it made clear that our precedents are no longer good law.

*Whatley*, 719 F.3d at 1216 (quoting *Perry*, 565 U.S. at 248). The Sixth Circuit, which had earlier held that "[a]ll of the concerns that underlie the *Biggers* analysis . . . are no less applicable when the identification takes place for the first time at trial," *Hill*, 967 F.2d at 232, reversed course after *Perry*, observing that the Supreme Court had clarified that the "due process rights of defendants identified in the courtroom under suggestive circumstances are generally met through the ordinary protections in trial," *United States v. Hughes*, 562 F. App'x 393, 398 (6th Cir. 2014); *see also Thomas*, 849 F.3d at 911 (holding that prior Tenth Circuit precedent requiring judicial reliability assessment for first-time in-court identifications "is no longer viable" after *Perry*). And although the Eighth Circuit

26

had previously applied *Biggers* to first-time in-court identifications, *see Rundell*, 858 F.2d at 426–27, that court likewise concluded that *Perry* changed the legal landscape enough that it was not plain error for a trial court to fail to conduct a reliability analysis of a first-time in-court identification, *see United States v. Shumpert*, 889 F.3d 488, 491 (8th Cir. 2018).

¶55 A small minority of courts have applied *Biggers* to first-time in-court identifications since *Perry* was decided.[7] Notably, some of those cases do not address *Perry* or its rationale in their analysis at all. *See, e.g.*, *United States v. Greene*, 704 F.3d 298, 305–06 (4th Cir. 2013); *City of Billings v. Nolan*, 383 P.3d 219, 224–25 (Mont. 2016).

¶56 Others of those courts have held that first-time in-court identifications will be excluded only where there is evidence of improper state action in eliciting the identification. For example, the U.S. District Court for the District of Columbia reasoned that an in-court identification procedure could be classified as state action under *Perry*, but that scrutiny under *Biggers* should be limited to those identifications where "the government d[oes] not have a basis for believing that the witness could make a reliable identification," and the identification is "merely an attempt to circumvent the due process constraints on one-man show[-]ups." *United States v. Morgan*, 248 F. Supp. 3d 208, 213 & n.2 (D.D.C. 2017). The Seventh Circuit similarly declined to consider all first-time in-court

---

[7] *See, e.g.*, *Lee v. Foster*, 750 F.3d 687, 691–92 (7th Cir. 2014); *United States v. Greene*, 704 F.3d 298, 305–06 (4th Cir. 2013); *United States v. Morgan*, 248 F. Supp. 3d 208, 211–15 (D.D.C. 2017); *State v. Dickson*, 141 A.3d 810, 822–27 (Conn. 2016); *City of Billings v. Nolan*, 383 P.3d 219, 224–25 (Mont. 2016).

identification procedures impermissibly suggestive, but specifically held that a witness's failure to identify a defendant in a pretrial photographic array is not enough to trigger a *Biggers* analysis. *See Lee v. Foster*, 750 F.3d 687, 691–92 (7th Cir. 2014).

¶57 In a 4-3 decision, the Connecticut Supreme Court agreed that *Perry* did not foreclose application of *Biggers* to first-time in-court identifications because a prosecutor's conduct could involve improper state action that should be deterred. *State v. Dickson*, 141 A.3d 810, 827–28 (Conn. 2016). But the court went a step further, holding that in cases where identity is at issue, first-time in-court identifications are so suggestive that they necessarily "implicate due process protections and must be prescreened by the trial court." *Id.* at 822–25. The court dismissed the Supreme Court's reference in *Perry* to the dubiousness of subjecting all in-court identifications to a reliability analysis as a "passing, general reference" that could not foreclose the "conclusion that [such identifications] can implicate due process concerns under certain circumstances." *Id.* at 828. The court then delineated new procedures for prescreening first-time in-court identifications. *Id.* at 835. *But see id.* at 849–50 (Zarella, J., concurring) (doubting state court's authority to adopt prophylactic rules under the United States Constitution).

Massachusetts' Supreme Judicial Court has also created a rule limiting in-court identifications where the eyewitness either was not asked to make an out-of-court identification, *Commonwealth v. Crayton*, 21 N.E.3d 157, 164–73 (Mass. 2014), or made an equivocal prior identification, *Commonwealth v. Collins*, 21 N.E.3d 528, 534 (Mass. 2014). These decisions, however, turn on state "[c]ommon law principles of fairness," and explicitly acknowledge the court's departure from U.S. Supreme Court jurisprudence.

*Crayton*, 21 N.E.3d at 165 (contrasting Massachusetts' test with the standard articulated in *Perry*).

Finally, the First Circuit has declined to take a side in the debate, concluding that the defendant's arguments for exclusion in that case failed either way. *United States v. Correa-Osorio*, 784 F.3d 11, 19–22 (1st Cir. 2015). If *Biggers* did not apply, the in-court identification was permissible because the defendant "received all the safeguards *Perry* stamped sufficient to protect . . . due process rights." *Id.* at 20. And even under *Biggers*, the First Circuit reasoned, the defendant "never gets to first base," because the only suggestion he alleged in his identification was "that he had a huge 'pick me' sign on him because . . . he was the only male defendant at counsel table." *Id.* at 21–22. *Correa-Osorio* suggests that the gap between these two approaches to in-court identifications may not be so wide: absent evidence of unusual suggestion, most courts ultimately allow in-court identifications to go to the jury.

## D. The Brothers' In-Court Identifications

¶58 Relying on the reasoning in *Perry*, we hold that where an in-court identification is not preceded by an impermissibly suggestive pretrial identification procedure arranged by law enforcement, and where nothing beyond the inherent suggestiveness of the ordinary courtroom setting made the in-court identification itself constitutionally suspect, due process does not require the trial court to assess the identification for reliability under *Biggers*.

¶59 We acknowledge the suggestiveness that inheres in identifying a defendant for the first time in court. But *Perry* rejected the argument that the Due Process Clause requires

29

judicial prescreening for reliability "any time an identification is made under suggestive circumstances." 565 U.S. at 240. And we cannot ignore that the Supreme Court implicitly dismissed the notion that the suggestiveness inherent in "all in-court identifications" itself justifies a *Biggers* analysis. *See id.* at 244. We further agree with the Court's implication that such a broad rule would be unworkable. *See id.*

¶60 Although the prosecution functions as a state actor in connection with law enforcement, *see Dickson*, 141 A.3d at 824, *Perry* made clear that *Biggers* prescreening is not required in the absence of *improper* state action. *See* 565 U.S. at 241–42, 245. Indeed, "[t]he very purpose of the check . . . [is] to avoid depriving the jury of identification evidence that is reliable, *notwithstanding* improper [law enforcement] conduct." *Id.* at 241. The inherent suggestiveness of an ordinary courtroom setting does not, without more, give rise to improper state action. The prosecution does not force the accused to sit at his counsel's table; instead, a defendant typically chooses to sit there (instead of in the audience) to assist in his defense. *See Correa-Osorio*, 784 F.3d at 20; *Whatley*, 719 F.3d at 1217. Because excluding a first-time identification made in an ordinary courtroom setting would not serve to deter improper law enforcement action, it would be inappropriate under *Perry. See* 565 U.S. at 241–42.

¶61 Nor are we inclined to require prescreening of in-court identifications in the narrower set of cases where, as here, the witness failed to identify the defendant in a pretrial procedure. Far from deterring improper state action, such a rule could disincentivize the use of properly conducted lineups and encourage the prosecution to try their luck in the (typically) suggestive trial setting. Moreover, there are legitimate

reasons why a witness might be better able to identify a defendant at trial—live, and in person, with view of his expression and manner—than in the sort of photographic array used in this case.

¶62    Finally, *Perry* made clear that ordinary trial safeguards are the appropriate checks on identifications made under suggestive circumstances not attributable to improper law enforcement conduct. *See id.* at 246–48.  Indeed, when a first-time identification takes place in court, counsel can expose—as defense counsel ably did in this case—any suggestiveness at work in the courtroom, *cf. Wade*, 388 U.S. at 230–31, while juries can make contemporaneous assessments of credibility.  And where a witness makes a first-time in-court identification, the witness's previous failure to identify the defendant presents ideal fodder for impeachment on cross-examination.  In short, we cannot, consistent with *Perry*, conclude that in-court identifications alleged to be suggestive simply because of the ordinary trial setting must be screened rather than subjected to cross-examination and argument before the jury.

¶63    Though we decline to require judicial prescreening of all in-court identifications under *Biggers*, we recognize, as we did in *Walker*, that some courtroom identifications not stemming from improper out-of-court identification procedures might still raise constitutional concern. Here, however, because Garner alleges no impropriety in the pretrial photographic arrays nor anything unusually suggestive about the circumstances surrounding the brothers' subsequent in-court identifications, we hold that federal due

process[8] did not require their exclusion at trial.[9]

## E. Evidentiary Challenges

¶64    That due process does not require a reliability hearing under Biggers does not strip

judges of their role as gatekeepers under the rules of evidence.  See *Perry*, 565 U.S. at

245–47 (declining to "enlarge the domain of due process" in part because of existing

safeguards against questionable identifications, including state and federal rules of

evidence).  Here, however, because Garner failed to object to the brothers' in-court

identifications under any particular rule of evidence, we agree with the court of appeals

that his evidentiary arguments are unpreserved.  We cannot hold that it was plain error

for the trial court not to exclude the identifications under CRE 403, 602, or 701 sua sponte.

## III.  Conclusion

¶65    We hold that where an in-court identification is not preceded by an impermissibly

suggestive pretrial identification procedure arranged by law enforcement, and where

nothing beyond the inherent suggestiveness of the ordinary courtroom setting made the

in-court identification itself constitutionally suspect, due process does not require the

trial court to assess the identification for reliability under *Biggers*.  Because Garner alleges

---

[8] We do not separately analyze our state constitutional due process guarantee because Garner has not argued that it should be interpreted any more broadly than its federal counterpart.

[9] Because application of *Biggers*' reliability test was not required for the in-court identifications at issue, we have no occasion to consider the additional factors Garner urges us to fold into that analysis.

no impropriety regarding the pretrial photographic arrays, and the record reveals nothing unusually suggestive about the circumstances of the brothers' in-court identifications, we hold that the in-court identifications did not violate due process. We further hold that Garner's evidentiary arguments are unpreserved and that the trial court's admission of the identifications was not plain error under CRE 403, 602, or 701. Accordingly, we affirm the judgment of the court of appeals.

**JUSTICE HART** dissents, and **JUSTICE HOOD** and **JUSTICE GABRIEL** join in the dissent.

JUSTICE HART, dissenting.

¶66    In *Neil v. Biggers*, the Supreme Court explained that when a procedure used to elicit eyewitness identification of a criminal defendant is "so unnecessarily suggestive and condu[cive] to irreparable mistaken identification that [the defendant] was denied due process of law" that procedure must be screened to ensure the reliability of the identification.  409 U.S. 188, 196 (1972) (quoting *Stovall v. Denno*, 388 U.S. 293, 302 (1967)).  In *Perry v. New Hampshire*, the Court made clear that the requirement for this due process check "turn[s] on the presence of state action . . . ."  565 U.S. 228, 233 (2012).  This case involves one of the most suggestive of all possible identification procedures — in-court identification.  The in-court identifications made in this case were arranged by a prosecutor — a member of law enforcement.   And they were conducive to irreparable misidentification because all three witnesses had failed to identify the defendant when presented with the opportunity to do so before trial.  Mr. Garner was entitled to have the proposed eyewitness identifications screened by the judge to evaluate their likely reliability before or, if necessary, even during trial.[1]

---

[1] I appreciate that the trial judge may not always know if the prosecution intends a first-time, one-on-one identification of the defendant at trial.  In the ordinary course, defense counsel should request a pre-trial hearing when there seems to be the potential for such an identification procedure.  If defense counsel is uncertain of the prosecution's intentions in this regard, she may request an order for discretionary disclosure to the defense by the prosecution under Crim. P. 16 (I)(d)(1).  The trial court may also institute a standard procedure requiring the prosecution to disclose to the court and defense counsel if she intends to attempt such an identification at trial.  *See* C.R.E. 104(a)

1

¶67 The majority concludes that *Perry* settled the question of whether in-court identifications should be screened for reliability. In fact, *Perry* did not even consider that question. And while many courts since *Perry* have reached the conclusion that the majority reaches today, those courts have failed to adequately consider what a growing body of science and experience have taught us about eyewitness identifications. As a result, they have failed to take seriously the due process concerns raised by first-time in-court identifications.

## A.

¶68 First-time in-court identifications are inherently suggestive. A witness appears in the courtroom, never having successfully identified the defendant before that moment, and is asked whether the defendant—the one person who the police and prosecutor

---

("Preliminary questions concerning the qualification of a person to be a witness . . . or the admissibility of evidence shall be determined by the court . . . ."); C.R.E. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ."); C.R.E. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter."); C.R.E. 611(a) ("The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth . . . ."). Indeed, there is nothing about the court's holding today that prevents trial courts from imposing such restrictions on the admission of evidence, irrespective of the majority's conclusion today regarding what due process requires. Just because a court *need* not hold a pretrial hearing as a matter of constitutional law does not mean that a court *should* not hold such a hearing under the rules of evidence. *Cf.* C.R.E. 102 (The rules of evidence "shall be construed to secure fairness in administration . . . and promotion of growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined.")

2

believe they have enough evidence to try for the crime in question—is in fact the right one. "It is hard to imagine a situation more clearly conveying the suggestion to the witness that the one presented is believed guilty . . . ." *United States v. Wade*, 388 U.S. 218, 234 (1967) (discussing show-up identification procedures). "The prosecutor, the witness, and everyone else in the courtroom are aware that the suspect is the individual seated at the defense table," and "[t]here is no way to safeguard the witness from influence caused by subtle cues in the prosecutor's questioning or not-so-subtle cues in the courtroom itself." Aliza B. Kaplan & Janis C. Puracal, *Who Could it Be Now? Challenging the Reliability of First-Time In-Court Identifications After* State v. Henderson *and* State v. Lawson, 105 J. Crim. L. & Criminology 947, 985 (2015). Witnesses faced with such a suggestive circumstance "may identify the defendant out of reliance on the prosecutor and in conformity with what is expected of them rather than because their memory is reliable." *Commonwealth v. Crayton*, 21 N.E.3d 157, 166–67 (Mass. 2014).

¶69 In-court identifications, like other eyewitness identifications, are also remarkably fallible. Amicus curiae, the Innocence Project, has found that eyewitness misidentification is the leading cause of DNA-confirmed wrongful convictions, with more than 70 percent of DNA exonerations involving eyewitness misidentification. Brief of Amicus Curiae The Innocence Project, at 3. "Of those [exonerees], more than half (53 percent) were misidentified in court." Shirley LaVarco & Karen Newirth, *Connecticut Supreme Court Limits In-Court Identification in Light of the Danger of Misidentification*, The Innocence Project (Aug. 29, 2016), https://perma.cc/4TSS-6D5G. Significantly, scientific research has demonstrated that eyewitness identifications are less reliable with the

passage of time. Nat'l Acad. of Sci., *Identifying the Culprit: Assessing Eyewitness Identification* 110 (2014) (hereinafter NAS Report).

¶70 Despite their lack of reliability, in-court identifications are also especially persuasive to a jury. As the majority acknowledges, "there is almost *nothing more convincing* than a live human being who takes the stand, points a finger at the defendant, and says 'That's the one!'" *Watkins v. Sowders*, 449 U.S. 341, 352 (1982) (Brennan, J., dissenting); *see also United States v. Correa-Osorio*, 784 F.3d 11, 29 (1st Cir. 2015) (Barron, J., concurring in part and dissenting in part) ("Eyewitness testimony is undeniably powerful. That testimony is all the more powerful when the eyewitness identifies the defendant right in front of the jury."); *United States v. Hill*, 967 F.2d 226, 231 (6th Cir. 1992) ("[O]f all the evidence that may be presented to the jury, a witness' in-court statement that 'he is the one' is probably the most dramatic and persuasive." (quoting *United States v. Russell*, 532 F.2d 1063, 1067 (6th Cir. 1976)); *State v. Henderson*, 27 A.3d 872, 889 (N.J. 2011) ("[T]here is almost *nothing more convincing* [to a jury] than" eyewitness identification of the defendant. (quoting *Watkins*, 449 U.S. at 352 (Brennan, J., dissenting))).

¶71 Unfortunately, in-court identification is also not susceptible to effective challenge through cross-examination because "cross-examination is far better at exposing lies than at countering sincere but mistaken beliefs." *State v. Dickson*, 141 A.3d 810, 832 (Conn. 2016) (quoting *State v. Guilbert*, 49 A.3d 705, 725 (Conn. 2012)); *see also* NAS Report, *supra*, at 110. A witness who mistakenly believes that he is accurately identifying the defendant will come across in cross-examination as quite sincere and confident. And while

4

confidence "is not a reliable predictor of the accuracy of the identification, especially where the level of confidence is inflated by its suggestiveness[,]" *Crayton*, 21 N.E.3d at 168, confidence can be very persuasive to a jury. In fact, "[s]tudies show that eyewitness confidence is the single most influential factor in juror determinations regarding the accuracy of an eyewitness identification." *State v. Lawson*, 291 P.3d 673, 705 (Or. 2012). The impact of confidence on juror evaluation of an identification makes it very hard for cross-examination to undercut an in-court identification. And this is particularly troubling in light of the numerous studies showing that "under most circumstances, witness confidence or certainty is not a good indicator of identification accuracy." *Id.* at 704. It is for these reasons that some state supreme courts are rethinking reliance on cross -examination as a guard against mistaken eyewitness identification. *See Dickson*, 141 A.3d at 832 (noting that "cross-examination is unlikely to expose any witness uncertainty or weakness" in the in-court identification); *Commonwealth v. Collins*, 21 N.E.3d 528, 536 (Mass. 2014) ("[C]ross-examination cannot always be expected to reveal an inaccurate in-court identification where most jurors are unaware of the weak correlation between confidence and accuracy and of witness susceptibility to manipulation by suggestive procedures or confirming feedback." (quoting Supreme Court Judicial Court Study Group on Eyewitness Evidence: Report and Recommendations to the Justices 20 (July 25, 2013) (internal quotation marks omitted))); *Henderson*, 27 A.3d at 918 (concluding that the state's earlier test for evaluating the reliability of eyewitness testimony rested too heavily on the assumption "that jurors would recognize and discount untrustworthy eyewitness testimony").

¶72    These characteristics of an in-court identification—its suggestiveness, fallibility, persuasiveness, and imperviousness to cross-examination—make first-time in-court identifications exactly the kind of identification procedure that is "conduc[ive] to irreparable mistaken identification . . . ." *Biggers*, 409 U.S. at 196. That, of course, is not the end of the analysis. The question remains: Are first-time in-court identifications *unnecessarily* suggestive and are they the product of state action, such that they fall under the ambit of the Constitution's protections?

**B.**

¶73    *Perry* did not consider, and does not resolve, the question we confront here today. *See Galloway v. State,* 122 So. 3d 614, 663 (Miss. 2013) ("The United States Supreme Court has not decided whether *Biggers* applies to an in-court identification not preceded by an impermissibly suggestive pretrial identification."), *cert. denied*, 572 U.S. 1134 (2014); *see also Dickson*, 141 A.3d at 821 ("The United States Supreme Court has not yet addressed the question of whether first time in-court identifications are in the category of unnecessarily suggestive procedures that trigger due process protections."). The majority's reliance on *Perry* unmoors that case from its factual setting and ignores the parallels between an unnecessarily suggestive pretrial identification procedure arranged by one branch of law enforcement—the police—and an unnecessarily suggestive in-court identification arranged by another branch of law enforcement—the prosecution.

¶74    In *Perry*, the Court was confronted with the following question: "Do the due process safeguards against the State's use of unreliable eyewitness identification evidence at trial apply to all identifications which arise from impermissibly suggestive

6

circumstances and which are very substantially likely to lead to misidentification, or only to those identifications which are also the product of 'improper state action'?" Brief for Petitioner at i, *Perry*, 565 U.S. 228 (No. 10-8974). The uniform focus of both the parties' briefs and the amicus briefs submitted to the Court in *Perry* was whether state action was or was not required to call into question the reliability of an eyewitness identification. *See generally* Brief for Petitioner, *Perry*, 565 U.S. 228 (No. 10-8974); Brief for Respondent, *Perry*, 565 U.S. 228 (No. 10-8974); Brief for the Am. Psychological Ass'n as Amici Curiae Supporting Petitioner, *Perry*, 565 U.S. 228 (No. 10-8974); Brief for the Nat'l Ass'n of Criminal Def. Lawyers as Amici Curiae Supporting Petitioner, *Perry*, 565 U.S. 228 (No. 10-8974); Brief for Wilton Dedge et al. as Amici Curiae Supporting Petitioner, *Perry*, 565 U.S. 228 (No. 10-8974); Brief for the Innocence Network as Amici Curiae Supporting Petitioner, *Perry*, 565 U.S. 228 (No. 10-8974); Brief for the Criminal Justice Legal Found. as Amici Curiae Supporting Respondent, *Perry*, 565 U.S. 228 (No. 10-8974); Brief for the State of Louisiana et al. as Amici Curiae Supporting Respondent, *Perry*, 565 U.S. 228 (No. 10 -8974); Brief for the United States as Amici Curiae Supporting Respondent, *Perry*, 565 U.S. 228 (No. 10-8974); Brief for the Nat'l Dist. Attorney's Ass'n as Amici Curiae Supporting Respondent, *Perry*, 565 U.S. 228 (No. 10-8974).

¶75 Of course, the context in which that question was being answered was a pretrial identification that had not been arranged by the police. The opinion, not surprisingly, in addressing the need for state action to implicate constitutional protections, focused on the need for police participation in the unnecessarily suggestive identification procedure. The only context in which *Perry* focused on in-court identification was when the Court

7

rejected Mr. Perry's argument that *any* suggestive identification should be subject to judicial screening. 565 U.S. at 240–44. I agree with the majority that the Supreme Court's reasoning in *Perry* forecloses the conclusion that *all* in-court identifications should be screened merely because in-court identification always involves an element of suggestiveness. But the Court's reasoning in *Perry* and in *Biggers* does not foreclose— and, I believe, requires—judicial screening of *some* in-court identifications. *See United States v. Morgan*, 248 F. Supp. 3d 208, 213 (D.D.C. 2017) ("Although the Supreme Court implied in *Perry* that it did not want *all* in-court identifications to be subject to judicial reliability screening, due process concerns require such screening for an initial in-court identification that is equivalent to a one-man showup." (internal citation omitted)). In particular, first-time in-court identifications like the one here are unnecessarily suggestive, conducive to irreparable misidentification, and arranged by law enforcement.

¶76    First-time in-court identifications are at least as suggestive as the pretrial identification processes disapproved of by this and other courts. *Dickson*, 141 A.3d at 822–23 ("[W]e are hard-pressed to imagine how there could be a *more* suggestive identification procedure than placing a witness on the stand in open court, confronting the witness with the person who the state has accused of committing the crime, and then asking the witness if he can identify the person who committed the crime. If this procedure is not suggestive, then *no* procedure is suggestive."). A first-time in-court identification is effectively a "show-up"—the witness is confronted with a single potential suspect and asked if he or she is the right one. But in-court identifications are in fact more suggestive than show-ups. A show-up might happen quite soon after a

8

crime, at a time when the police are still investigating and might not yet have settled on a suspect. An in-court identification, by contrast, presents a witness with the single person who the police and the prosecutor believe committed the crime and typically does so long after the commission of the crime.

¶77 Second, the chances of mistake in a first-time in-court identification are at least as likely and the consequences of the mistake are the same—a wrongful conviction. *See Hill*, 967 F.2d at 232 ("The due process concerns are identical in both cases and any attempt to draw a line based on the time the allegedly suggestive identification technique takes place seems arbitrary. All of the concerns that underlie the *Biggers* analysis, including the degree of suggestiveness, the chance of mistake, and the threat to due process are no less applicable when the identification takes place for the first time at trial.").

¶78 And finally, first-time in-court identification, like impermissibly suggestive pretrial identifications, involves the state action that *Perry* explained was necessary to raise due process concerns. In pretrial identifications, the law enforcement arm whose misconduct might be deterred by the *Biggers* screening requirement is the police. When a prosecutor—another arm of law enforcement—is considering asking for a first-time in-court identification, requiring a judicial screening will deter that prosecutor from simply gambling that the courtroom setting will produce the desired identification. As the Connecticut Supreme Court recognized in prohibiting in-court identifications that were not preceded by an appropriate pretrial identification, "the rationale for the rule excluding identifications that are the result of unnecessarily suggestive procedures—

9

deterrence of improper conduct by a state actor—applies equally to prosecutors." *Dickson*, 141 A.3d at 824.[2]

¶79    A first-time in-court identification will only occur when a witness has either not had an opportunity to identify the defendant before trial or, as happened here, has failed to identify the defendant when given the opportunity. In either case, the prosecution should be required to explain why it believes the in-court identification will be sufficiently reliable to avoid the irreparable harm of a mistake caused by the suggestive setting.

## C.

¶80    For these reasons, I believe that a first-time in-court identification requires pretrial screening applying the factors set forth in *Biggers*.[3] If the trial court had conducted that screening here, it is unlikely that the three brothers would have been permitted to identify Mr. Garner for the first time from the witness stand. *Biggers* requires a court to consider

---

[2] The rule adopted by both the Connecticut and the Massachusetts courts—that an in-court identification must be preceded by an appropriate pretrial identification—has much to recommend it and may one day be recognized as required by due process. Cognizant of concerns about a state supreme court's authority to adopt prophylactic rules under the federal Constitution, I confine myself here to the application of the Supreme Court's established test for screening eyewitness identifications procured through unnecessarily suggestive state action.

[3] I agree with the majority that requiring this screening only for in-court identifications that are preceded by a failure to identify could disincentivize the police to use appropriate pretrial identification procedures. And I believe that the conduct that application of the *Biggers* screen would seek to deter in this context is *any* use of first-time in-court identifications. Of course, the brothers' failure to identify Mr. Garner in a photo line-up is something the court would consider as part of the screening process.

the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation[,]

and to assess the reliability of an identification. 409 U.S. at 199–200. Considering each of those factors here, the likely reliability of the brothers' in-court identifications was extremely low.

¶81 As described by many witnesses in attendance, the shooting occurred in a very short period of time, during which the three brothers were scared for themselves and for each other. They had very little time to view who was shooting and each of them testified that their attention during that time was not on the shooter's face. Substantial scientific evidence shows that "eyewitness memory for persons encountered during events that are . . . highly stressful . . . may be subject to substantial error." *Henderson*, 27 A.3d at 904 (quoting Charles A. Morgan III et al., *Accuracy of Eyewitness Memory for Persons Encountered During Exposure to Highly Intense Stress*, 27 Int'l J.L. & Psychiatry 265, 274 (2004)); *see also Lawson*, 291 P.3d at 700–01. Moreover, as we have previously acknowledged, "recognition accuracy [is] poorer when the perpetrator [holds] a weapon." *Bernal v. People*, 44 P.3d 184, 190 (Colo. 2002) (quoting Vaughn Tooley et al., *Facial Recognition: Weapon Effect and Attentional Focus*, 17 J. of Applied Soc. Psychology 845, 854 (1987)).

¶82 The passage of time between the crime and the confrontation was significant; the shooting occurred three full years before the trial. Research demonstrates that "the more

11

time that passes, the greater the possibility that a witness' memory of a perpetrator will weaken." *Henderson*, 27 A.3d at 907.

¶83    The three brothers offered wildly varying descriptions of the shooter over the course of the investigation.  Initially, one described him as a young, bald man with the word "north" tattooed on his head.  Another described him as a Hispanic man with short black hair.  Later, two of the brothers said the shooter had both a mustache and a soul patch.  Each of the brothers also gave differing descriptions of the shooter's clothes — one said he wore a bandana, another said jeans and tennis shoes, and the third said a dark shirt.  Of these various items of clothing, the only one that Mr. Garner was wearing that night was a dark shirt.

¶84    If the court had screened for reliability before trial, the only evidence it would have had that would go to the brothers' "level of certainty" would be the fact that none of the three was able to identify Mr. Garner in a photo array as the person who shot at them that night, notwithstanding their later courtroom assertions of certainty and that they would never forget Mr. Garner's face.  In fact, one of the brothers specifically said that Mr. Garner had been in the bar but that he was not the shooter.  The brothers had no certainty at all before walking into the courtroom about their ability to identify Mr. Garner as the shooter.[4]

---

[4] While the brothers' testimony from the stand reflected an extremely high level of certainty, certainty and accuracy do not have a high level of correlation.  *See, e.g.*, Neil Brewer, et al., *The Confidence-Accuracy Relationship in Eyewitness Identification*, 8 J.

¶85 Given these facts, a pretrial screening for reliability quite likely would have led the court to conclude that the brothers' first-time in-court identifications lacked any likelihood of reliability and prevented a very high risk of the irreparable mistaken identification that due process protects against. Mr. Garner may or may not have committed the crime for which he was convicted. The process by which he was convicted was fundamentally unfair. Our Constitution requires more.

¶86 I respectfully dissent. I am authorized to state that JUSTICE HOOD and JUSTICE GABRIEL join in this dissent.

---

Experimental Psychol. Applied 44, 44–45 (2002) ("[T]he outcomes of empirical studies, reviews, and meta-analyses have converged on the conclusion that the confidence-accuracy relationship for eyewitness identification is weak . . . ."). For that reason, many states have replaced the "certainty" factor in the *Biggers* analysis. *See, e.g.*, *State v. Herrera*, 902 A.2d 177, 186 (N.J. 2006); *Brodes v. State*, 614 S.E.2d 766, 771 (Ga. 2005).